**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

LEONARD ANDREW SAYLES, JR, a/k/a
Leno,
*Defendant-Appellant.*

No. 00-4833

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ROBERT JARED SMITH,
*Defendant-Appellant.*

No. 00-4859

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CR-99-198)

Argued: May 9, 2002

Decided: July 10, 2002

Before WILKINS, MICHAEL, and MOTZ, Circuit Judges.

---

Affirmed in part and vacated and remanded in part by published opinion. Judge Motz wrote the opinion, in which Judge Wilkins and Judge Michael joined.

---

**COUNSEL**

**ARGUED:** Brian Alexander Glasser, BAILEY & GLASSER, L.L.P., Charleston, West Virginia; John G. Hackney, Jr., Charleston, West Virginia, for Appellants. John J. Frail, Assistant United States Attorney, Charleston, West Virginia, for Appellee. **ON BRIEF:** Kasey Warner, United States Attorney, Charleston, West Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted Leonard Sayles and Robert Jared Smith of various drug offenses; Sayles was also convicted of a related firearm violation. The district court sentenced Sayles to 295 months of imprisonment, followed by a five-year term of supervised release; the court sentenced Smith to life imprisonment, followed by a five-year term of supervised release. Sayles and Smith appeal, challenging their convictions and sentences. We affirm their convictions, vacate their sentences, and remand for resentencing.

I.

At trial, a number of law enforcement officers testified regarding their investigation and surveillance of drug distribution activities at the City Park apartment complex on Roseberry Circle in Charleston, West Virginia. On January 28, 1999, two officers conducting video surveillance observed both Smith and Sayles engaging in "hand-to-hand" transactions involving substances that appeared to be illegal drugs.

The officers videotaped Smith carrying "a plastic bag containing a white tan hard substance," apparently selling illegal drugs to others. Smith then drove away from Roseberry Circle in a purple Maxima. Law enforcement officers stopped the Maxima; a subsequent search yielded $1,690 on Smith's person and digital scales with cocaine residue in the center console of his car. Officers also recovered nearby

3.7 grams of crack, which had been thrown from the Maxima by one of Smith's passengers, John Clements, immediately prior to the stop. At the police station, Smith asked an officer "how are you going to hold me after [Clements] done told you the dope was his?"

As to Sayles, on January 28, 1999, the officers at Roseberry Circle videotaped him attempting to give money to another co-defendant and carrying "a plastic bag with a [large amount of] white tan substance up against his shirt." Nine months later, on September 22, 1999, officers stopped a white Mustang, in which Sayles was a passenger. Officers recovered one weapon underneath the driver's seat, which the driver admitted was his, and a second weapon, a Lorsin .380 pistol, underneath the passenger seat where Sayles had been riding; officers also recovered digital scales from Sayles's seat. At the police station, officers found 4.01 grams of crack on Sayles. In addition, one officer testified at trial that Sayles admitted that the gun under the passenger seat was his and told the officers that he carried the gun because "some of his boys . . . were getting shot."

The prosecution's expert testified that drug dealers (not users) carry digital scales and crack amounts greater than three-and-a-half grams. Other named co-defendants who pled guilty to various related drug charges also testified against Smith and Sayles. Arbera Ross, an admitted drug dealer, testified that he sold crack to Smith "four or five times" during 1998, ranging from 100 grams to a "dub" (i.e., $200 worth of cocaine for $100). Ross also testified that he had sold Sayles crack "[a]bout ten times . . . from a hundred grams and the rest would be ounces." Marvin Garrett, another drug dealer, testified that he "lost count" of the times he had seen Smith distributing crack to others and had obtained from six grams to an ounce of crack from Smith on ten to twenty occasions from 1995 to 1999. Garrett also testified that he and Sayles had cooked cocaine into crack "numerous times . . . [f]or resale on the streets." According to Garrett, he received "a hundred dub" or "a couple grams" of crack from Sayles "[a]bout ten or more times" and had observed Sayles distributing crack to others "[m]ore than 20 times" from 1995 to 1999.

In his defense, Smith proposed to call John Clements, the co-conspirator who was Smith's passenger during the January 28 traffic stop. But the district court permitted Clements's attorney to assert

Clements's Fifth Amendment right to refuse to testify. Smith then called Herman James, another co-defendant, who also asserted his Fifth Amendment privilege. Neither Smith nor Sayles called any other witnesses.

The jury convicted Sayles of one count of conspiracy to distribute fifty grams or more of cocaine base in violation of 21 U.S.C.A. § 846 (West 1999), two counts of possession with intent to distribute cocaine base in violation of 21 U.S.C.A. § 841(a)(1) (West 1999), and one count of carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C.A. § 924(c)(1)(A) (West 2000). The jury convicted Smith of one count of conspiracy to distribute fifty grams or more of cocaine base in violation of 21 U.S.C.A. § 846, and one count of aiding and abetting possession with intent to distribute cocaine base in violation of 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2 (West 2000).

At sentencing, the district court applied a four-level enhancement to Smith, as an "organizer or leader," and sentenced him to life imprisonment on the drug conspiracy count and twenty years on the aiding and abetting count, to be served concurrently, followed by five years' supervised release. The district court applied a two-level enhancement to Sayles for his lesser aggravating role and sentenced him to 235 months on each of the three drug counts, to be served concurrently, a 60-month consecutive sentence on the firearm count, and five years' supervised release.

Smith and Sayles challenge both their convictions and sentences on several grounds. Only two of these challenges merit extended discussion.

## II.

Smith contends that the district court erred in permitting John Clements's counsel to invoke Clements's Fifth Amendment privilege against self-incrimination and so allowing Clements to avoid testifying on Smith's behalf. (Smith makes no similar claim with respect to Herman James's proposed testimony.)

Smith's counsel attempted to elicit testimony from Clements, who had entered into a plea agreement as to a distribution count of the same indictment in which Smith and Sayles were charged. Clements's attorney stated that Clements would "take the Fifth" if called. His attorney explained that Clements had a "good faith basis" to do so because, *inter alia*, "there could be issues raised . . . that would concern uncharged conduct for which Mr. Clements does not have immunity." The district court then held a hearing outside the presence of the jury, in which Smith's counsel stated that his inquiries "would be limited to the question of whether [Smith] aided and abetted [Clements] in a distribution" as alleged in the indictment, particularly regarding the money officers seized from Smith during the traffic stop on January 28, 1999. Smith's counsel proffered:

> that if he had taken the stand, Mr. Clements would have testified that Mr. Smith did not aid and abet him in the distribution which is alleged in count 5. It is also my understanding that his testimony would have been that at the time he was arrested on January 29th or 28th, 1999 that he had in his possession certain sums of money and that Mr. Smith had certain sums of money and that when that money was found, the officers, particularly Officer Rinehart[,] took the money — took all of the money from the two of them and told the two of them that they were going to put the drugs on Mr. Clements and the money on Mr. Smith.

The court noted that it had not yet accepted Clements's plea or sentenced Clements, and Clements's counsel stated that "because there is no termination of prosecution clause [in Clements's plea agreement] . . . it's possible that he could be prosecuted for other activities." Clements's attorney then asked Clements, under oath, "if you were called as a witness in this trial and were asked questions by either the defense or the prosecution, would you invoke your Fifth Amendment right to silence." Clements answered, "[y]es," and the court excused him.

The Sixth Amendment grants a defendant the right to compel testimony by witnesses in his defense. When a defendant's right to compel testimony conflicts with a witness' privilege against self-incrimination, however, a court must "make a proper and particular-

ized inquiry into the legitimacy and scope of the witness' assertion of the privilege." *Gaskins v. McKellar*, 916 F.2d 941, 950 (4th Cir. 1990). A court can excuse a witness from testifying "only if the court finds that [the witness] could legitimately refuse to answer any and all relevant questions." *Id.*; *accord Hoffman v. United States*, 341 U.S. 479, 486-88 (1951); *Rogers v. United States*, 340 U.S. 367, 374 (1951).

In this case, we need not determine if the district court erred in failing to make a more specific inquiry to determine whether Clements could claim a valid Fifth Amendment privilege. This is so because even if the court did err, that error was harmless.

An error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). Even if the district court had conducted a more particularized inquiry, *and* that inquiry had resulted in Clements being permitted to testify, *and* Clements had testified that Smith did not aid and abet him in possessing and distributing crack on January 28, 1999, we believe it clear beyond a reasonable doubt that a jury nevertheless would have found Smith guilty of that crime.

Law enforcement officers testified to seeing Smith, Sayles, Clements, and others, including Arbera Ross and Marvin Garrett, engaged in illegal drug distribution activity at the Roseberry Circle complex for several hours on January 28, 1999. Officers videotaped Smith and Clements engaging in these activities, and the prosecution then played important portions of those videotapes to the jury. Eventually officers reported that Smith and Clements left the area in a purple Maxima — with Smith driving and Clements in the passenger seat. After a police cruiser activated flood lights and sirens to stop the Maxima, officers testified that "an arm came out of the passenger window" and threw an object out; that an officer within five minutes recovered the object, which police later tested and found to be 3.7 grams of crack. The police searched Smith and found $1,690, mostly in twenty dollar bills, and drug scales in his car. Two of Smith's and Clements's co-conspirators, Ross and Garrett, substantiated the police officers' account of Smith and Clements's drug activity on January 28, 1999. Given this evidence, even if Clements had testified as Smith proffered

he would, it is clear beyond a reasonable doubt that any reasonable jury would have convicted Smith of aiding and abetting Clements in possession with intent to distribute cocaine on January 28, 1999.[1]

### III.

Both Smith and Sayles argue that the district court erred in increasing their offense levels at sentencing. The district court assessed a four-level increase on Smith for his aggravating role as an "organizer or leader" in the drug conspiracy, and a two-level increase on Sayles for his lesser aggravating role in the conspiracy. We review a district court's decision to apply a sentencing adjustment based on a defendant's role in the offense for clear error. *United States v. Sheffer*, 896 F.2d 842, 846 (4th Cir. 1990).

To qualify for a *four*-level increase under § 3B1.1(a) of the Sentencing Guidelines, like that imposed on Smith for his role in the conspiracy, a defendant must have been "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sentencing Guidelines Manual (U.S.S.G.) § 3B1.1(a) (1999). The Guidelines provide for a *three*-level increase if a "defendant was a manager or supervisor (but not an organizer or

---

[1]Sayles maintains that insufficient evidence supports his conviction for the firearm offense, using or carrying a weapon during and in connection with a drug trafficking offense in violation of 18 U.S.C.A. § 924(c). We can set aside his conviction only if no reasonable jury could have concluded beyond a reasonable doubt that he committed this crime. *See United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). At trial, the prosecution offered more than sufficient evidence to satisfy this standard, including the handgun found beneath the passenger seat where Sayles had been seated while carrying more than four grams of crack prepared for individual sale, and Sayles's admission that the gun was his and that he carried it for protection because "some of his boys . . . were getting shot." *See Muscarello v. United States*, 524 U.S. 125, 126-27 (1998) (holding that one carries a firearm within the meaning of § 924(c)(1) if he carries the firearm anywhere inside a vehicle); *United States v. Mitchell*, 104 F.3d 649, 654 (4th Cir. 1997) (stating that "if a firearm is carried for protection or intimidation, it is carried 'in relation to' the drug trafficking offense within the meaning of § 924(c)(1)" (citation omitted)).

leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Finally, § 3B1.1(c) provides for a *two*-level increase when a court finds, as the district court did with respect to Sayles, that a defendant "was an organizer, leader, manager, or supervisor in any criminal activity other than that discussed in [§ 3B1.1] (a) or (b)." U.S.S.G. § 3B1.1(c).

Neither Smith nor Sayles argues that the charged conspiracy involved fewer than five participants. Rather, each of them raise a single contention: the Government did not produce evidence that he functioned as any sort of "organizer, leader, manager or supervisor" in the conspiracy.

The Sentencing Commission has indicated that a court should consider seven factors in determining a defendant's "leadership and organizational role." U.S.S.G. § 3B1.1, cmt. n.4. These include: "[1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others." *Id.*

The district court made abbreviated findings in support of its decision to increase Smith and Sayles's offense levels. With respect to Smith, the court simply stated:

> Mr. Smith has an elevated role in this organization, he is at the level just below Mr. Ross and Mr. James, and he shares on the same level with the absent Mr. Groom, and he is involved as an organizer and leader in an organization that involves five or more people and, consequently, the court sets the 4 points on that.

When Smith's counsel objected that "no evidence" had been "offered" at the sentencing hearing "to support" the four-level increase, the district court responded that it relied on the findings in the presentence report and the evidence at trial. The probation officer's presentence report, in turn, contains only the following "finding" as to "Adjustment for Role in the Offense":

The evidence suggests that Mr. Smith was a leader in criminal activity involving five or more participants. The participants include Arbera Ross, Simernon Rogers, Calvin Dyess, as sources of supply for the defendant's distribution and Ronald Tinsley, and Ivan Lee as distributors for the defendant. If the court finds Mr. Smith held an aggravating role, the probation officer believes a 4-level increase is appropriate.

In Sayles's case, the presentence investigation report recommended that because the conspiracy involved five or more participants and Sayles "had at least three sources of supply for crack cocaine and one person stated that he sold crack *for* Mr. Sayles on approximately 20 occasions,"(emphasis added),[2] Sayles was "by definition a leader in criminal activity involving five or more participants" and, therefore, "a 4 level increase is appropriate." The district court adopted these findings but rejected the recommendation, explaining that "the testimony supported" Sayles's contention that he was "a lesser player in this conspiracy." For this reason, the district court assessed Sayles "only a two-point enhancement, pursuant to 3B1.1(c)."

These are the only findings supporting the role adjustments assessed against Smith and Sayles. No matter how generously these findings are read, the sole justification offered for imposition of an adjustment for a leadership or management role on Smith and Sayles is that they bought and sold crack. But being a buyer and seller of illegal drugs, even in league with more than five or more other persons, does not establish that a defendant has functioned as an "organizer, leader, manager or supervisor" of criminal activity. *See United States v. Anderson*, 189 F.3d 1201, 1212 (10th Cir. 1999); *United States v. Medina*, 167 F.3d 77, 80-81 (1st Cir. 1999); *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994). *Cf. United States v. Bartley*, 230 F.3d 667, 673-74 (4th Cir. 2000) (affirming § 3B1.1 adjustment and noting "[t]his is not a case in which a defendant simply supplied drugs

---

[2]This statement and a similar statement quoted above in Smith's presentence report reference only drug sales by Smith and Sayles; the Government does not contend that Smith or Sayles controlled their buyers, nor does the trial testimony establish that Smith or Sayles controlled those who purchased drugs from them.

and negotiated their sale"); *United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997) (affirming § 3B1.1 adjustment and rejecting defendant's contention that "he only had a buyer/seller relationship with his codefendants").

The Government does not contend to the contrary. Nor does the Government argue that it introduced evidence that Smith or Sayles "exercise[d] decision making authority." *See* U.S.S.G. § 3B1.1, cmt. n.4; *Perkins*, 108 F.3d at 518 (affirming § 3B1.1 adjustment when defendant facilitated criminal enterprise by "renting apartments, acquiring pagers, hiring a lawyer for a codefendant, and paying for the bond of another codefendant"); *United States v. Brooks*, 957 F.2d 1138, 1152 (4th Cir. 1992) (affirming § 3B1.1(b) adjustment when defendant, *inter alia*, paid employees of the drug operation and "effectively ran the operation while her husband was ill").

Similarly, the Government does not claim that its evidence demonstrated that Smith or Sayles "plan[ned] and organize[d]" the drug trafficking or "exercise[d] . . . control and authority over others" in the conspiracy. *Compare* U.S.S.G. § 3B1.1, cmt. n.4; *Bartley*, 230 F.3d at 673-74 (affirming § 3B1.1(b) adjustment when defendant directed others as to where to mail and transport drugs, set prices and terms of payment, arranged logistics of deliveries, and gave advice as to how to market the product); *United States v. Al-Talib*, 55 F.3d 923, 932 (4th Cir. 1995) (affirming § 3B1.1(b) adjustment when defendant "acted as a manager in a large criminal enterprise, supervising the preparation of marijuana for shipment and sending out his inferiors to deliver the drugs"); *United States v. Kincaid*, 964 F.2d 325, 329 (4th Cir. 1992) (affirming § 3B1.1(c) adjustment when defendant "exercised control" over "co-conspirator . . . by providing him with specific instructions on the circumstances under which he could sell narcotics from [defendant's] residence," directed other drug transactions, and instructed another as to abduction of a drug dealer and how to obtain a refund for unsatisfactory cocaine).

The Government does, however, contend that it offered evidence proving two of the factors relevant to an aggravating role determination as to Smith and one as to Sayles. Specifically, the Government argues that its evidence established that both Smith and Sayles "recruited" drug couriers and that Smith retained "a larger share of the

proceeds" of the drug conspiracy. *See* U.S.S.G. § 3B1.1, cmt. n.4. Such evidence could provide the basis for a § 3B1.1 adjustment only it if demonstrated that Sayles was an organizer, leader, manager or supervisor of *people*. *See United States v. Capers*, 61 F.3d 1100, 1109 (4th Cir. 1995); *see also Bartley*, 230 F.3d at 673-74 (affirming § 3B1.1(b) adjustment where the evidence showed the defendant "controlled the activities of other participants" and "exercised management responsibility," by, *inter alia*, "handling proceeds" and "direct[ing] others to wire proceeds from the drug distribution activities or to receive such transfers of funds on his behalf"). In this case, evidence of recruitment and retention of a larger share of the proceeds cannot demonstrate this since such evidence does not exist.

Neither in its brief nor at oral argument could the Government provide any record citation supporting its contention that it offered such evidence. Smith and Sayles included the entire trial transcript in the joint appendix to support their contentions that the Government failed to produce evidence of recruitment or Smith's retention of a larger share of the proceeds. We have carefully reviewed that transcript and can only agree.

The trial was short, with testimony consuming only part of two days; as the district court noted prior to instructing the jury, the evidence was "rather briefly presented." For the most part, the Government relied on the testimony of ten law enforcement officers and employees, who related what they observed on January 28, 1999, and September 22, 1999, displayed the video tapes made on the former date, described the searches resulting from these observations, provided chain of custody evidence, and presented expert opinions. None of these witnesses would seem to be in a position to have actual knowledge as to Smith's or Sayles's possible aggravating roles; in any event, none of these witnesses were questioned on those matters.

The Government did also offer the testimony of co-conspirators Ross and Garrett, who presumably might have been able to supply evidence as to Smith and Sayles's respective roles in the conspiracy, if they had been asked to do so. But they were never asked about this. Rather, in response to the prosecutor's questions, Ross simply identified Smith and Sayles and testified that he had sold crack to both of them; Garrett also identified Smith and Sayles and testified that he

and Sayles "converted cocaine powder to crack," that he purchased crack from Sayles and Smith, and that he observed Sayles sell crack and Smith buy crack from others. Neither Ross nor Garrett were questioned about, or testified to, recruitment efforts by either Smith or Sayles or whether Smith took a larger share of the profits from the drug conspiracy.

In sum, the Government certainly produced ample evidence that both Smith and Sayles bought and sold significant amounts of cocaine.[3] But the Government offered no evidence that either defendant recruited drug couriers or that Smith claimed a larger share of the fruits of the conspiracy. Of course, this is not to say Smith and Sayles did not recruit others, or that Smith did not retain a larger share of the drug conspiracy profits, or, for that matter, that Smith and Sayles did not act as decision-makers or exercise control over others. Smith and Sayles may have done some or all of these things, but at their short trial, the Government failed to present such evidence. Given the total absence of evidence as to Smith's or Sayles's aggravating role, we must conclude that the district court clearly erred in its application of U.S.S.G. § 3B1.1. *See United States v. Harriott*, 976 F.2d 198, 202 (4th Cir. 1992) (vacating and remanding for resentencing when district court clearly erred in applying U.S.S.G. § 3B1.1). Accordingly, we vacate their sentences and remand for resentencing in accord with this opinion.[4]

---

[3]Sayles's contention that the district court erred in determining the quantity of controlled substances attributable to him as relevant conduct clearly fails. The district court attributed to Sayles 940 to 960 grams of crack. Sayles argues that Ross's testimony on this point at trial conflicted with his testimony at Sayles's sentencing hearing. Even if we agreed, Garrett's consistent testimony at trial and at sentencing provided evidence fully supporting the threshold quantity of crack needed to sustain the sentence. *See United States v. Uwaeme*, 975 F.2d 1016, 1018 n.8 (4th Cir. 1992).

[4]Sayles has filed a *pro se* motion to amend his appellate brief, which we have granted. He argues in his amendment that his indictment violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The argument is meritless. *See United States v. Roberts*, 262 F.3d 286, 291 (4th Cir. 2001) (holding no *Apprendi* error existed when none of defendant's concurrent sentences exceeded the statutory maximum) (citing *United States v. Kinter*, 235 F.3d 192, 201-02 (4th Cir. 2000)).

## IV.

For the foregoing reasons, we affirm Smith and Sayles's convictions, but vacate their sentences and remand for resentencing.

*AFFIRMED IN PART AND VACATED*
*AND REMANDED IN PART*