PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KENNY CAMERON,

*Defendant-Appellant.*

No. 08-4277

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph R. Goodwin, Chief District Judge.
(2:07-cr-00142-1)

Argued: May 15, 2009

Decided: July 21, 2009

Before Sandra Day O'CONNOR, Associate Justice
(Retired), Supreme Court of the United States,
sitting by designation, and NIEMEYER and GREGORY,
Circuit Judges.

Affirmed in part, vacated in part, and remanded by published
opinion. Judge Gregory wrote the opinion, in which Associate
Justice O'Connor and Judge Niemeyer joined.

## COUNSEL

**ARGUED:** Jonathan D. Byrne, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Charleston, West Virginia, for Appel-

lant. Steven Loew, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, Edward H. Weis, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

## OPINION

GREGORY, Circuit Judge:

The Appellant, Kenny Cameron, was convicted of three counts of uttering counterfeited obligations of the United States, in violation of 18 U.S.C. § 472 (2006); and one count of falsely making and counterfeiting obligations of the United States, in violation of 18 U.S.C. § 471 (2006). At sentencing, the district court applied a four-level enhancement because it found that Cameron was a leader or organizer of a counterfeiting operation that involved five or more participants. Cameron challenges both his conviction under 18 U.S.C. § 471 as well as the district court's application of the enhancement. For the reasons set forth below, we affirm Cameron's conviction but vacate his sentence and remand for resentencing.

### I.

On October 3, 2003, Cameron made a purchase from the Tobacco Plus store in Dunbar, West Virginia, using a counterfeit twenty-dollar bill. The store owner suspected that the bill was counterfeit and called the police. Two Dunbar police officers, Scott Dempsey and Charles Young, responded to the call. When the officers arrived on the scene, Officer Young asked Cameron to give him the change from the transaction. Although Cameron complied with the request, the officers noticed that Cameron kept his left hand clenched. From this,

the officers surmised that Cameron was attempting to conceal an object in his hand. Officer Dempsey grabbed Cameron's left wrist, causing him to unclench his hand and reveal a second counterfeit twenty-dollar bill. Cameron was then arrested and taken to the police station, where he admitted that he passed a counterfeit bill at the Tobacco Plus store and that he planned to pass the second counterfeit bill.

After Cameron's arrest, police officers and United States Secret Service personnel executed a search warrant on the home of Cameron's grandmother, where Cameron was residing at the time of his arrest. In an upstairs bedroom, officers found cut and uncut counterfeit bills, an X-Acto cutting board,[1] currency envelopes, and a counterfeit detection pen. While officers were searching the home, Cameron arrived in a vehicle being driven by Brett Reynolds. Reynolds consented to a search of the vehicle, and officers found sixteen counterfeit $100 bills in a paper box located in the passenger-side floorboard.

The following day, police officers and Secret Service personnel executed a search warrant on the home of Cameron's sister. During this search, officers recovered a computer, paper cuttings, printer ink cartridges, ink refills, and a printer manual.

At trial, the Government presented testimony from Secret Service agents who analyzed several of the items recovered from the homes. Vici Inlow, a fingerprint expert with the Secret Service, testified that Cameron's fingerprints were discovered on eight of the sixty-one counterfeit bills found in his grandmother's home. Special Agent Mark Grantz, a computer forensic examiner, testified that a deleted file was recovered from the computer found in the home of Cameron's sister.

---

[1]Special Agent Thomas Sheppard of the United States Secret Service testified that X-Acto cutting boards can be used to cut bills so that the bills have straight edges. (J.A. 100.)

According to Special Agent Grantz, the file contained an image of a twenty-dollar bill that matched the serial number of one of the bills that was seized from the home of Cameron's grandmother.

At the close of the Government's case, Cameron moved for a judgment of acquittal on the count of falsely making and counterfeiting obligations of the United States, claiming that the Government had not produced sufficient evidence that he actually manufactured the counterfeit bills.[2] The district court denied Cameron's motion, and the jury returned guilty verdicts on all counts.

At sentencing, Cameron objected to a recommended four-level enhancement for being the leader or organizer of the counterfeiting operation. In support of the enhancement, the Government presented the testimony of Ashley Campbell, a participant in the counterfeiting operation. Campbell testified that her role in the operation was to make small purchases with the counterfeit bills and return the change to Jessie Smith, another participant in the operation. Reynolds recruited people into the operation and supervised the participants, and the earnings from the scheme were ultimately split between three participants—Reynolds, Smith, and Jason D'Arco.

By contrast, Campbell's testimony provided little insight into the nature of Cameron's involvement in the operation beyond his manufacturing of counterfeit bills. According to Campbell, she first met Cameron when she, D'Arco, Smith, and Reynolds picked him up from his place of work and

---

[2]Cameron also objected to the district court's failure to provide his proposed "reasonable doubt" instruction to the jury. While Cameron presents this issue on appeal, he acknowledges that this argument is contrary to our established precedent. *See, e.g.*, *United States v. Najjar*, 300 F.3d 466, 486 (4th Cir. 2002); *United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998).

drove him home. At that time, Smith and Reynolds gave Cameron cocaine and a genuine $100 bill. Reynolds then entered Cameron's home and returned a few minutes later with the same bill.

Two days later, Campbell, D'Arco, Smith, and Reynolds again drove to Cameron's home. This time, Reynolds went into the home and returned ten minutes later with counterfeit bills. Although Campbell could not say how many bills Reynolds received from Cameron, she testified that Reynolds gave her eight counterfeit $100 bills and that Reynolds used the rest of the bills to purchase approximately $2000 worth of marijuana. Campbell had no knowledge of the nature of the relationship between Reynolds and Cameron, but she knew that Cameron supplied the counterfeit bills for the operation.

In addition to the testimony of Campbell, the district court had before it the presentence investigative report ("PSR") and the representations made by the Government during sentencing. According to the PSR, Secret Service agents had traced counterfeit bills manufactured by Cameron to at least twelve states, and the loss attributed to the operation was determined to be $10,520. The Government further proffered that the counterfeit bills had been passed in over 250 businesses.

Based on this evidence, the district court overruled Cameron's objection to the enhancement, stating that it was "very comfortable that this manufacturing operation was extensive and that the person who did the manufacturing of the bills and the distribution of them, or a leader of that enterprise[,] was this defendant." (J.A. 304.) The court continued: "This was a rather major counterfeit operation and this—you know, it's like saying Henry Ford wasn't a leader of Ford, he just made the cars. This defendant made money. He decided who to turn it over to. He passed it himself. He received drugs." (J.A. 304-05.) After applying the recommended enhancements, including a two-level enhancement for manufacturing the counterfeit bills, Cameron's total offense level was nineteen and his

criminal history category was III, which yielded a Guidelines range of thirty-seven to forty-six months' imprisonment. The district court ultimately sentenced Cameron to a term of forty-six months' imprisonment, followed by a three-year term of supervised release.

## II.

### A.

Cameron first challenges his conviction on the count of falsely making and counterfeiting obligations of the United States, 18 U.S.C. § 471. In a criminal case tried by a jury, we must sustain a guilty verdict "'if there is substantial evidence, taking the view most favorable to the Government, to support it.'" *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). In this context, "substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* To that end, this Court "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982); *accord United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008).

### B.

Cameron advances several arguments in support of his contention that the Government did not present substantial evidence to support his conviction for manufacturing counterfeit bills: (1) there was no evidence during trial regarding the inside details of the counterfeiting operation; (2) the link between the computer seized from his sister's home and the counterfeiting operation was weak, since the computer contained only one image of a counterfeit bill; (3) there was no evidence that Cameron himself used the computer to create

counterfeit bills; (4) officers did not recover a printer when they searched his sister's home; and (5) Cameron's fingerprints were identified on only eight of the sixty-one documents recovered from his residence.

Cameron's arguments, however, discount the significance of the circumstantial evidence introduced by the Government at trial and the reasonable inferences that may be drawn therefrom. In Cameron's room at his grandmother's home, officers found the trappings of a counterfeiting operation—cut and uncut counterfeit bills, cutting equipment, a counterfeit detection pen, and currency bills. The fact that Cameron's fingerprints were identified on several of the counterfeit bills further connects him to the operation.

Even if the evidence recovered from Cameron's residence would not have been sufficient on its own to sustain his conviction, that was not the only evidence presented at trial. The computer and evidence of printing found in his sister's home, in combination with the evidence recovered from Cameron's residence, was more than sufficient to sustain his conviction. Using file recovery software, Special Agent Grantz discovered a deleted computer file that contained an image of a twenty-dollar bill. He testified that the serial number from that bill matched one of the counterfeit bills found in Cameron's residence. Taken together, the evidence from Cameron's residence and his sister's home creates a more than reasonable inference that Cameron manufactured the counterfeit bills found in his place of residence.

While Cameron points out that Special Agent Grantz discovered only one image on the computer and the officers did not actually find a printer in his sister's home, these facts must be weighed against the considerable evidence of manufacturing recovered from both homes. Given the "circumscribed scope of our review," *Burgos*, 94 F.3d at 862, the evidence connecting Cameron to the manufacturing of coun-

terfeit bills was sufficient to sustain his conviction for that offense.

## III.

### A.

Cameron next challenges the district court's application of the four-level enhancement at sentencing for being a leader or organizer of the counterfeiting operation. We review all sentences for reasonableness under an abuse-of-discretion standard. *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008) (citing *Gall v. United States*, 128 S. Ct. 586, 590 (2007)). "In assessing whether a sentencing court properly applied the Guidelines, 'we review the court's factual findings for clear error and its legal conclusions de novo.'" *Id.* (quoting *United States v. Allen*, 466 F.3d 522, 527 (4th Cir. 2006)).

### B.

Section 3B1.1(a) of the United States Sentencing Guidelines (2007) provides for a four-level increase (the so-called "leadership enhancement") in a defendant's offense level "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The Sentencing Commission has clarified in an Application Note to § 3B1.1 that in order to qualify for an enhancement, the defendant must have been the organizer or leader "of one or more other participants" as opposed to merely "exercis[ing] management responsibility over the property, assets, or activities of a criminal organization." *See* U.S.S.G. § 3B1.1 cmt. n.2. In determining a defendant's "leadership and organizational role," courts must consider seven factors:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the

claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

U.S.S.G. § B1.1, cmt. n.4; *see also United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002) (discussing the seven-factor test).

In *Sayles*, this Court provided insight regarding the type of evidence needed for a district court to assess a § 3B1.1 enhancement. The defendants in that case, Robert Jared Smith and Leonard Sayles, were participants in a drug distribution conspiracy. The Government presented evidence from co-conspirators that both defendants purchased and sold crack to other participants in the conspiracy. Furthermore, one of the co-conspirators testified that Sayles was involved in the conversion of cocaine powder to crack. Based on this evidence, the district court assessed the leadership enhancement to Smith and a lesser two-level enhancement to Sayles.[3] *Id.* at 220-22.

In reversing the district court's application of the § 3B1.1 enhancements, this Court held that "being a buyer and seller of illegal drugs, even in league with more than five or more other persons, does not establish that a defendant has functioned as an 'organizer, leader, manager, or supervisor' of criminal activity." *Id.* at 225. That is because an adjustment under § 3B1.1 is proper "only . . . if it [was] demonstrated that [the defendant] was an organizer, leader, manager or supervi-

---

[3]Sayles received a two-level enhancement under U.S.S.G. § 3B1.1(c) for being an "organizer, leader, manager, or supervisor in any criminal activity other than that discussed in [§ 3B1.1] (a) or (b)." 296 F.3d at 224. While the leadership enhancement at issue in this case is different from the two-level enhancement in some respects, the application of both enhancements depends on the same seven-factor test. *See* U.S.S.G. § 3B1.1 cmt. n.4.

sor of *people*." *Id.* at 226. Although the Government contended that it had presented evidence that both defendants had recruited other participants and that Smith had retained a larger share of the proceeds from the conspiracy, no such evidence was found in the record. Without evidence of the defendants' aggravating role in the conspiracy beyond the buying and selling of "significant" quantities of drugs, this Court found that the district court clearly erred in applying the enhancement to the defendants. *Id.* at 226-27.

As in *Sayles*, the Government failed to present evidence at Cameron's trial or during his sentencing demonstrating that his role in the conspiracy was that of an organizer or leader of people, as opposed to that of a manager over the literal and figurative "currency" of the counterfeiting operation. There was no evidence that Cameron planned or organized the operation, exercised any control or authority over other participants, recruited accomplices into the operation, or claimed *any* share—much less a larger share—of the fruits of the criminal activity. If anything, the testimony elicited from Campbell suggested that the other participants, and Reynolds in particular, organized and led the counterfeiting operation. Although it is true that more than one person may qualify as an organizer or leader of a criminal operation, U.S.S.G. § 3B1.1, cmt. n.4, Campbell's testimony highlights the paucity of evidence supporting the application of the leadership enhancement in this case.

The Government nevertheless contends that this Court should defer to the district court's judgment because Cameron manufactured bills for the counterfeiting operation. According to the Government, Cameron's integral role as the manufacturer of the bills effectively gave him the authority to control the flow of the bills to the other participants. However, this argument misses the mark because it conflates the *potential* to exercise control over an operation with the *actual* exercise of control. In the cases in which this Court has affirmed the application of the leadership enhancement, there was evidence

that the defendants actually exercised authority over the other participants in the operation or actively directed its activities. *See, e.g.*, *United States v. Jones*, 356 F.3d 529, 538 (4th Cir. 2004), *cert. denied*, 541 U.S. 952 (2004) (defendant recruited dealers, controlled the allocation of drugs to dealers, determined how the profits were divided, and handled the logistics and arrangements for the transactions); *United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997) (defendant "directed the activities of other members of the drug ring and facilitated the criminal enterprise by renting apartments, acquiring pagers, hiring a lawyer for a codefendant, and paying for the bond of another codefendant").

If we were to adopt the position urged by the Government, any defendant who supplies a good or service to a criminal operation would automatically qualify for the leadership enhancement because he or she could potentially leverage that role to control the other participants in the operation. Such an outcome is contrary to the letter and spirit of the Sentencing Guidelines. The Sentencing Commission amended its Application Notes to clarify that the enhancement applies only to defendants who organize or lead "one or more other participants" and not to those who just "exercise[ ] management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, cmt. n.2. The Government's position ignores this distinction.

Furthermore, Cameron's sentence already reflects his role in the counterfeiting operation through application of § 2B5.1(b)(2)(A) of the Sentencing Guidelines, which provides a two-level increase where a defendant manufactured or produced counterfeit obligations of the United States. The existence of this separate enhancement suggests that, at least in the context of counterfeiting operations, a defendant must exercise a leadership role beyond the manufacturing of counterfeit bills in order to be subject to the leadership enhancement.

The Government is thus left with evidence that Cameron supplied counterfeit bills to one other participant in an extensive counterfeiting operation and that Cameron himself passed bills on one occasion. As this Court already decided in *Sayles*, the supplying of contraband to other participants in a conspiracy and involvement in illegal transactions, without more, cannot sustain the application of the leadership enhancement. *See* 296 F.3d at 227. And although the extensiveness of a criminal activity is a relevant consideration in determining whether the leadership enhancement should apply, U.S.S.G. § 3B1.1 cmt. n.4, the Government urges this Court to give this factor more weight than it deserves. If the extensiveness of a criminal activity were enough to justify the assessment of the leadership enhancement, then all participants in an extensive operation would be subject to the leadership enhancement regardless of whether there was any evidence that the particular participants were leaders or organizers of the operation. Such an interpretation is clearly contrary to § 3B1.1, which provides enhancements "[b]ased on the defendant's role in the offense."

## IV.

We affirm Cameron's conviction for falsely making and counterfeiting obligations of the United States. However, because the district court clearly erred in applying the leadership enhancement in calculating Cameron's offense level, we vacate his sentence and remand the case to the district court for resentencing.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*