**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-4404**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

RUBEN NOYOLA GARCIA,

        Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, District Judge. (3:07-cr-00079-FDW-7)

Submitted: January 29, 2010      Decided: February 19, 2010

Before MICHAEL, KING, and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Mauro Barreiro, LAW OFFICE OF MAURO BARREIRO, Edinburg, Texas, for Appellant. Edward R. Ryan, Acting United States Attorney, Charlotte, North Carolina; Amy E. Ray, Assistant United States Attorney, Asheville, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ruben Noyola Garcia was convicted by a jury of conspiracy to possess with intent to distribute at least 100 kilograms of marijuana, 21 U.S.C.A. §§ 846, 841(b)(1)(B) (West 1999 & Supp. 2009) (Count One), and possession of at least 100 kilograms of marijuana with intent to distribute, 21 U.S.C.A. § 841(a), (b)(1)(B), 18 U.S.C. § 2 (2006). Garcia challenges his conviction and sentence. We affirm.

The government's evidence at trial established that in January 2007 a tractor-trailer truck was stopped in Mississippi because it lacked a visible Department of Transportation number. Inspection revealed that it contained rotting fruit and $1.2 million in cash in several suitcases. The driver, Benito Delagarza, cooperated and made two recorded telephone calls to his boss, Ruben Barraza, who was listed on documents in the truck's cab as the owner of the trucking company. Barraza agreed to send money so that Delagarza could return to Texas and said he did not know "how much" was in the truck, but that Delagarza should get a receipt for it. Delagarza later recorded two conversations with Garcia in Texas, during which they discussed preparations for two more trips using a blue truck and transporting 2000 "pesos" to Charlotte, North Carolina. Drug Enforcement Administration (DEA) Agent Hurst, who helped conduct

2

the investigation in Texas, testified that the defendants used the term "pesos" to mean pounds.

On March 19, 2007, Delagarza recorded audio and video tape of a truck being loaded at a warehouse leased by Barraza. The lights in the warehouse were dimmed while packages were loaded first, then the lights were turned back on and a forklift was used to fill the truck with pallets of produce. Garcia, Ruben Barraza, Edgar Barraza, and co-defendant Juan Garza were present, with Barraza operating the forklift.

Federal agents kept the truck under surveillance and unloaded produce and more than 2000 pounds of marijuana from the truck shortly afterward. The marijuana was flown to North Carolina. Delagarza drove the truck to Charlotte, where the agents reloaded the marijuana onto the truck. Delagarza called Barraza on March 22, 2007, and was told to go to a warehouse leased to co-defendant Patrick Schwenke. After the marijuana was unloaded by Schwenke, Juan Sanchez-Solorzano, and others, they were arrested, as was co-defendant Sharu Bey, who arrived to buy marijuana. On the same day, Garcia and Garza sent a moneygram to Delagarza.

In April and at the end of May 2007, Delagarza drove loads of marijuana to Indianapolis, Indiana, and to Durham, North Carolina, as directed by Barraza and Garcia. Ruben Barraza and Garcia were arrested in June 2007. Edgar Barraza

3

became a fugitive. Garcia, Barraza, and Bey went to trial and were convicted on all counts. Garza, Schwenke, Sanchez-Solorzano, and two other co-defendants entered guilty pleas; however, only Sanchez-Solorzano testified at the trial. Delagarza was expected to testify, but disappeared shortly before the trial began.

Before trial, the government moved to admit tape recordings of the monitored conversations between Delagarza and defendants Barraza and Garcia. The district court granted the motion, finding that the defendants' inability to cross-examine Delagarza did not violate the Confrontation Clause because the recorded conversations were among co-conspirators. The court held that Delagarza's statements were not hearsay because they were not offered for "the truth of the matter asserted," Fed. R. Evid. 801, but to provide a context for the defendant's statements. The government requested a limiting instruction, to which the court agreed.

During the trial, Garcia and Barraza expressed frustration at Delagarza's absence. Garcia's attorney asked DEA Agent Patina, who was in charge of the Charlotte investigation, if he knew where Delagarza was, although Barraza's attorney did not agree that the question should be asked. Patina said he did not know. At the close of the government's evidence, Garcia's attorney informed the court that he intended to request a

4

missing witness instruction; later, he decided not to do so. Garcia did point out in his closing argument that neither Delagarza nor Schwenke had testified.

In sentencing Garcia, the district court held him responsible for over 4000 kilograms of marijuana, resulting in a base offense level of 34, U.S. Sentencing Guidelines Manual § 2D1.1(c)(3) (2007), as recommended in the presentence report. The court decided that Garcia had a managerial or supervisory role, USSG § 3B1.1(b), rather than a leadership role, a determination with which defense counsel agreed. The court determined that a gun found in Garcia's desk at his body shop next to a telephone used for calls to co-conspirators warranted an enhancement under USSG § 2D1.1(b)(1). Garcia's offense level was 38. He was in criminal history category I, which gave him an advisory guideline range of 262-327 months. The district court sentenced him to a term of 280 months.

On appeal, Garcia first challenges the manager/supervisor role adjustment. Because he did not contest the district court's decision at sentencing, our review is for plain error. United States v. Olano, 507 U.S. 725, 732-37 (1993). Garcia contends that the district court failed to analyze the factors set out in Application Note 3 to § 3B1.1 as significant to the determination of a defendant's role. He further argues that the trial evidence was ambiguous as to his

role in the conspiracy and showed only Barraza in a leadership position. However, the audio and videotapes recorded Garcia speaking authoritatively with Delagarza about future shipments, as well as participating in sending money to Delagarza after the Charlotte delivery. Both Delagarza and Garza described Garcia as "involved" with all the known shipments. Garza said Garcia directed and organized shipments and had paid him for his work on one shipment. With this evidence before it, the district court did not plainly err in finding that Garcia had a managerial or supervisory position in the conspiracy.

Garcia next contests the weapon enhancement. A two-level increase is authorized under § 2D1.1(b)(1) if the defendant possessed a dangerous weapon during the offense. Application Note 3 to § 2D1.1 explains that the enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." The district court's factual finding that Garcia possessed a dangerous weapon during the offense is reviewed for clear error. United States v. McAllister, 272 F.3d 228, 234 (4th Cir. 2001). The government "need only show that the weapon was present during the relevant illegal drug activity." Id. Pertinent factors the court may consider are the type of weapon and its location. United States v. Manigan, ___ F.3d ___, 2010 WL 298031, at *5-6 (4th Cir. Jan. 26, 2010). Courts have noted

6

that drug dealers are more likely to use handguns than long guns.  Id. at *5.  Also, the accessibility of firearms during drug activities is a relevant factor.  Id. at *6.

Here, Patina testified at Garcia's sentencing that the DEA agents in Texas learned that meetings relating to the conspiracy were held in Garcia's body shop.  This information was corroborated by Garza.  The gun was found in Garcia's desk next to a phone used for calls related to the conspiracy.  Garcia argues that the district court clearly erred in relying on Patina's testimony rather than his own assertion that he had found the gun in a vehicle being worked on in the body shop.  He points out that the gun was not mentioned in trial testimony and that Patina did not specify how many meetings there were, who was present, or what was discussed.  He also maintains that Garza was an unreliable source of information because, when he first began to cooperate, he did not admit the full extent of his participation in the conspiracy.  However, we conclude that the district court did not clearly err in rejecting Garcia's assertion that the gun's presence in his desk was accidental and finding that it was not clearly improbable that the gun was connected to the conspiracy.

Garcia next contends that the district court considered unreliable and unsubstantiated evidence to find him responsible for 4790.45 kilograms of marijuana and concedes only

that he was properly held responsible for the marijuana shipped to Charlotte, which was slightly less than 1000 kilograms. We review the district court's calculation of the quantity of drugs attributable to a defendant for sentencing purposes for clear error. United States v. Randall, 171 F.3d 195, 210 (4th Cir. 1999). "A defendant's base offense level under the Guidelines for drug conspiracy cases is determined by the amount of drugs "reasonably foreseeable to him within the scope of his unlawful agreement." United States v. Lamarr, 75 F.3d 964, 972 (4th Cir. 1996). The government must establish the quantity of drugs attributable to a defendant by a preponderance of the evidence and may do so through the introduction of relevant and reliable evidence. United States v. Jones, 31 F.3d 1304, 1316 (4th Cir. 1994). "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. USSG § 2D1.1, cmt. n.12. "The district court is afforded broad discretion as to what information to credit in making its calculations." United States v. Cook, 76 F.3d 596, 604 (4th Cir. 1996) (internal quotation marks omitted). "A district court may properly convert cash amounts linked credibly to the defendant's purchase or sale of narcotics" as long as the court does not double count the proceeds and the drugs, and "[d]irect or hearsay testimony of lay witnesses . . . can provide

8

sufficiently reliable evidence of quantity." United States v. Sampson, 140 F.3d 585, 592 (4th Cir. 1998) (internal citations omitted).

Garcia contends that only Delagarza connected him to the $1.2 million seized in Mississippi (1869.69 kilograms of marijuana equivalent) and that Delagarza was not a credible source of information. However, Delagarza's phone call to Barraza established Barraza's connection to the money when Barraza encouraged Delagarza to get a receipt for it, and Delagarza's subsequent recorded conversation with Garcia and videotape of Garcia and Barraza loading marijuana together established the conspiratorial relationship between Garcia and Barraza. Thus, Delagarza's claim that Garcia was also involved with the shipments to Indianapolis (616.44 kilograms) and Durham (861.84 kilograms) was not incredible. Garza said Garcia paid him $1000 for his assistance with one of those shipments. Further, Garcia's involvement with the Durham delivery was corroborated by Garza. Garcia argues that Patina's statement that $300 per pound was the price for marijuana in Texas was speculative. However, Garcia did not inquire about the source of Patina's information during his cross-examination of Patina.

Finally, Garcia argues that no evidence connected him to the 453.6 kilograms of marijuana derived from ledgers or logs of prior drug transactions seized from Schwenke's warehouse in

9

Charlotte. While this claim appears to have some merit, reducing the total quantity attributed to Garcia by 453.6 kilograms leaves a total of 4336.85 kilograms, well within the range of 3000-10,000 kilograms for base offense level 34. Thus, any error in attributing the 453.6 kilograms to Garcia did not affect his sentence. We conclude that credible evidence of Garcia's direct involvement with at least 3000 kilograms of marijuana was presented to the district court, and its determination that Garcia was responsible for that amount was not clearly erroneous.

Garcia also asserts that the evidence was insufficient to support the jury's guilty verdict. A jury conviction in a criminal case must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. United States v. Cameron, 573 F.3d 179, 183 (4th Cir. 2009) (internal quotation and citation omitted). Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. Id. The reviewing court must consider circumstantial as well as direct evidence and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established. Id.

Garcia argues that all of his activities and conversations that were in evidence at trial were consistent with legitimate, non-criminal business and social conduct. However, the verdict was supported by Garcia's presence with Barraza at the warehouse when the truck was loaded with marijuana, his recorded conversations with Delagarza about future deliveries (even though marijuana was not overtly discussed), and his presence with Garza when money was wired to Delagarza after the marijuana was delivered in Charlotte. This evidence was sufficient to permit the inference that Garcia was conspiring with Barraza, Delagarza, and others to traffic in marijuana. Therefore, this issue is without merit.

Last, Garcia claims that his attorney was ineffective at trial in failing to move for an acquittal at the close of the government's case and at the close of all evidence. He also argues that his attorney was ineffective at sentencing in conceding that an adjustment for a manager or supervisor role was appropriate. Claims of ineffective assistance of counsel are generally not cognizable on direct appeal. United States v. King, 119 F.3d 290, 295 (4th Cir. 1997). Rather, to allow for adequate development of the record, a defendant must bring his claim in a 28 U.S.C.A. § 2255 (West Supp. 2009) motion. See id.; United States v. Hoyle, 33 F.3d 415, 418 (4th Cir. 1994). An exception exists when the record conclusively establishes

ineffective assistance.  United States v. Richardson, 195 F.3d 192, 198 (4th Cir. 1999); King, 119 F.3d at 295.

Here, Garcia's claim is in part factually incorrect because his attorney did make a Rule 29 motion for acquittal at the close of the government's case and at the close of all evidence.  Further, the record does not establish conclusively that his attorney was ineffective in conceding that a manager/supervisor role adjustment should be applied. Therefore, Garcia's claim of ineffective assistance is not cognizable in this appeal.

Accordingly, we affirm the sentence imposed by the district court.  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED