**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEVEN C. STANLEY,
Plaintiff-Appellee,

v.

LIEUTENANT HEJIRIKA; CORRECTIONAL
OFFICER JOHNSON; CORRECTIONAL
OFFICER MCMILLEN; SERGEANT
KEENAN; CORRECTIONAL OFFICER
DEMBY,
Defendants-Appellants,                                              No. 97-6214

and

A. ROBINSON, Sergeant; LIEUTENANT
FREEMAN; CORRECTIONAL OFFICER
BELLEMY; CORRECTIONAL OFFICER
GUY; CORRECTIONAL OFFICER JANAES;
CORRECTIONAL OFFICER JENNIFER;
VICTOR JARAMILLO,
Defendants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
James E. Kenkel, Magistrate Judge.
(CA-94-1454-S)

Argued: October 27, 1997

Decided: January 21, 1998

Before WILKINS, NIEMEYER, and WILLIAMS, Circuit Judges.

_____

Reversed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Wilkins and Judge Williams joined.

**COUNSEL**

**ARGUED:** Glenn William Bell, Assistant Attorney General, Baltimore, Maryland, for Appellants. Timothy Joseph Sullivan, SULLIVAN & SULLIVAN, College Park, Maryland, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellants.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The magistrate judge in this case found that correctional officers had used unconstitutionally excessive force in subduing the leader of a group of rebellious prisoners in the context of a prison disturbance and, under 42 U.S.C. § 1983, awarded the prisoner $1,000 in compensatory damages and $2,000 in punitive damages. On the officers' appeal, we reverse, concluding as a matter of law that in the context of quelling a prison disturbance or rebellion, (1) the evidence was insufficient to establish the requisite subjective culpability of the correctional officers, and (2) the correctional officers' conduct, taken in context, did not exceed an objectively <u>de minimis</u> threshold for excessive force.

I

On January 6, 1994, the inmates in the A-Wing Segregation Tier of the Maryland House of Correction-Annex in Jessup, Maryland, rebelled after a correctional officer refused an inmate request for recreation. The A-Wing Segregation Tier is a special tier reserved for inmates who have committed disciplinary violations. The inmates began setting fires by dropping burning papers outside their cells. They set off the sprinkler systems and stopped up their toilets in order to flood the tier, and they threw objects from their cells. It took correctional officers five hours to restore order.

To quell the disturbance, Lt. Hejirika, the building shift supervisor, assembled an "extraction team" of eight correctional officers. The

2

team planned to remove the ringleaders of the disturbance from their cells one at a time, search them, remove all their personal property from the cells, and then return them to their cells. The activities of the extraction team were to be, and in fact were, videotaped.

The officers compiled a list identifying seven inmates as the ringleaders or "primary troublemakers" of the disturbance. Steven Stanley was first on the list. He was also the oldest inmate in the tier and was looked up to by the others. Stanley has been an inmate at the Maryland House of Correction since 1979, serving a 20-year sentence for armed robbery. During the period of his incarceration, Stanley has had a history of unruly behavior as an inmate, having been cited on various occasions for setting fires, creating floods, throwing objects, and threatening inmates and correctional officers. He has also been involved in at least one "takeover" of the tier. Indeed, during the events involved in this case, Stanley was housed in the A-Wing because of a disciplinary infraction.

As planned, the extraction team removed all seven "primary troublemakers" from their cells, searched the cells, removed all personal belongings, and then returned the inmates to their cells. During the process, the officers discovered at least one "shank," a homemade knife. Two of the ringleaders were particularly uncooperative, and the officers found it necessary to use pepper spray to subdue them. Although Stanley's extraction proceeded without physical incident, he was uncooperative and expressed anger toward the officers, warning them, "Don't be grabbing on me," and threatening to "stab one of these dumb bitches." According to the officers, when Stanley continued to encourage inmates to set fires and began "forcefully hitting" his cell door, Major Waverly Ray, the shift commander, ordered that Stanley be removed from his cell a second time and be placed in an isolation cell. Before moving Stanley, the officers placed steel handcuffs on him. They then escorted him to the isolation cell where they intended to remove the steel handcuffs and replace them with flexible plastic handcuffs which were more secure. Stanley continued his verbal abuse, stating that he would "f--k this whole goddamn jail up" and telling the officers that he would "f--k one of you bitches up."

The videotape shows two officers escorting Stanley to the bottom tier where the isolation cell is located, but loses sight of him as they

3

turn into the cell. Stanley testified that during this brief instant when he was not on camera,

> [Officer] Johnson took and mashed my head on the side of the door. . . . I was telling [the officers] that I don't care nothing about them grabbing on me, and he pushed me in the back of the head, and my face hit the side of the wall going in to the door.

The officers testified that after Stanley was taken into the cell and braced against the wall to change his cuffs, he began to resist. At that point, the tape shows an officer pushing Stanley firmly against the wall with his forearm at the back of Stanley's neck. It shows other officers then taking Stanley down to the ground, face down, and leaning on top of him to subdue him, while one of the officers ties the "flexicuffs" around Stanley's wrists behind his back. Stanley is heard complaining that he is being squashed and that he feels as if his arm is being broken. The tape shows the other officers standing around without much activity and Lt. Hejirika taking notes. Once the flexicuffs were in place and leg irons were placed on Stanley, he was taken for medical treatment. The videotape shows Stanley complaining of pain about his mouth and arm, but it also shows his refusal to accept any medical treatment. After that visit Stanley was returned to the isolation cell.

It was during the period depicted in the videotape-- i.e., when Stanley was first being taken to the isolation cell and having his cuffs changed -- that Stanley claims the correctional officers used excessive force. In addition to what the videotape showed, Stanley explained how he was being hurt. The magistrate judge characterized Stanley's testimony as follows:

> The plaintiff testified that at this point in the isolation confinement cell, his head was forcefully held against the wall by defendant Johnson. He testified that defendant Johnson hit him in the base of the skull, punched him in the face, kneed him repeatedly while he was on the ground and also choked him. He further testified that defendant McMill[e]n twisted his arm while holding him.

4

Plaintiff also testified that defendant Demby twisted his fingers back in order to obtain a reflex of resistance; pushed his legs to cause him to hit the cell floor; that defendant Keenan kicked him in the face; that unidentified members of the extraction team were choking him and kicking his side, legs, and ankles.

All parties agree that Stanley suffered injuries as a result of the incident, which the magistrate judge found to be "bruising of his right arm, left jaw, left and right wrists and back, and a tooth which was loosened."

On May 31, 1994, Stanley filed the complaint in this case, and it was assigned, by consent of the parties, to a magistrate judge for trial. Following trial, the magistrate judge found for Stanley, awarding him $1,000 in compensatory damages for pain and suffering and $2,000 in punitive damages. In reaching this conclusion, the judge found that the defendants were motivated by malice and acted in concert to administer a beating to Stanley. The judge relied on the videotape which he found "clearly shows all of the members of the team acting in concert in surrounding plaintiff and positioning themselves in such a way as to allow a controlled beating to be inflicted with minimal visual exposure." He concluded that Stanley's injuries, "while not severe," were not de minimis for Eighth Amendment purposes, basing that conclusion on a comparison of Stanley's injuries with those sustained by the prisoner in Hudson v. McMillian , 503 U.S. 1 (1992).

This appeal followed.

II

The correctional officers contend that, as a matter of law, the force that they used and the injuries that Stanley sustained in the circumstances of this case did not cross the de minimis threshold for excessive force under the Eighth Amendment. They suggest that "in an apparent philosophical disagreement with the day-to-day management of maximum security prisons, the court, in finding these officers liable, wrongfully substituted its judgment for that of State correctional officials." They argue that in the context of a "major disturbance . . . on the segregation tier, including fires and flooding," it is reasonable

5

to assume that correctional officers must use some force. They also argue that the officers used only justifiable force to handcuff a resisting and kicking inmate. Indeed, they contend that "these injuries, mostly bruises . . . corroborate the version of the occurrence testified to by the correctional officers."

In addition to the officers' argument that their use of force was objectively reasonable, the officers also contend that "there was not a scintilla of evidence" submitted to support subjective bad faith that they acted with malice and ill will for the purpose of causing harm. They argue that the only evidence on which the magistrate judge relied to make a finding of malice was the videotape, which they claim shows the contrary.

Stanley accepts the statement of historical facts made by the officers in their brief but contends that the conclusions to be drawn from them must be what the magistrate judge found because he was in the best position to review the facts during the two-day hearing and that his findings were supported by substantial evidence. Stanley's argument on appeal rests squarely on the magistrate judge's factual findings and legal conclusions, and he urges that they be affirmed for the reasons given by the magistrate judge.

While we review the magistrate judge's application of law to the facts de novo, we review his findings of fact for clear error. In reviewing for clear error, we do not substitute our own judgment for that of the trial court unless we are "left with the definite and firm conviction that a mistake has been committed." Miller v. Mercy Hosp., Inc., 720 F.2d 356, 361 (4th Cir. 1983); see also Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). We have also noted, however, that "the conviction of mistake may properly be based upon a conclusion that, without regard to what the actual facts may be, the findings under review were induced by an erroneous view of the controlling legal standard or are not supported by substantial evidence." Brice v. Virginia Beach Correctional Ctr., 58 F.3d 101, 106 (4th Cir. 1995) (internal quotation marks omitted).

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This protection, enforced against the states through the Fourteenth Amendment, pro-

6

tects inmates against the application of excessive force by correctional officers. See Whitley v. Albers, 475 U.S. 312, 318-19 (1986). Not every unpleasant action taken by prison officials against inmates, however, violates the Eighth Amendment. "After incarceration, only the unnecessary and wanton infliction of pain constitutes . . . cruel and unusual punishment forbidden by the Eighth Amendment." Id. at 319 (internal quotation marks omitted).

To prove a claim that prison officials violated his constitutional rights through the excessive use of force, an inmate must satisfy two requirements. First, he must satisfy a subjective requirement that the force used by the corrections officers "inflicted unnecessary and wanton pain and suffering." Hudson v. McMillian , 503 U.S. 1, 6 (1993). In the context of a prison disturbance, this question "ultimately turns on `whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Id. (quoting Whitley, 475 U.S. at 320-21). When evaluating evidence to determine whether it is legally sufficient to satisfy the subjective component, a court may allow an inmate's claim to go to the jury only if it concludes that the evidence, viewed in a light most favorable to the claimant, "will support a reliable inference of wantonness in the infliction of pain." Id.  at 322.

In addition to satisfying the subjective requirement, the inmate must also satisfy an objective requirement; he must show that correctional officers' actions, taken contextually, were"objectively harmful enough" to offend "contemporary standards of decency." Hudson, 503 U.S. at 8 (internal quotation marks omitted). In determining whether the objective component is satisfied, the factfinder must evaluate the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose. Thus, in Whitley, the Court found that in the context of quelling a major prison disturbance, a correctional officer's use of force in shooting an inmate in the leg was "part and parcel of a good-faith effort to restore prison security" and did not violate the inmate's Eighth Amendment rights. 475 U.S. at 326. On the other hand in Hudson, in the context of a verbal argument, the Court found that blows deliberately directed to the inmate to punish him, causing bruises, swelling, loosened teeth, and a cracked dental plate, were suf-

7

ficient to support an excessive force claim in violation of the Eighth Amendment. See 503 U.S. at 10.

In recognition that the prison environment is a dangerous one for correctional officers, prison administrators must be accorded "wide-ranging deference" to design and implement policies and practices that in their judgment are necessary for the preservation of order and security. Whitley, 475 U.S. at 321-22. Thus, when prison security measures are taken in response to an uprising or prison disturbance, the courts cannot always expect a perfectly measured response. "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Id. at 319 (emphasis added). On the other hand, when a prisoner is held and calmly beaten by two guards in response to a verbal argument, the de minimis level is more easily reached.

In short, for an inmate to prove an excessive force claim, he must satisfy not only the subjective component that the correctional officers acted with a sufficiently culpable state of mind, but also the objective component that his alleged injury was sufficiently serious in relation to the need for force to establish constitutionally excessive force. See Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

III

We now turn to the question of whether the magistrate judge correctly addressed the subjective component of the Hudson test. In assessing this component, the magistrate judge found:

> [I]t is clear that the defendants were motivated by malice and ill will in the application of force against plaintiff, either in retaliation for plaintiff's participation in the disturbance or his continued abusive and hostile language and verbal provocations. The court does not substitute its judgment for that of the prison officials the decision to move plaintiff to the isolation cell, nor does the court question the decision to replace the steel handcuffs with the flex-cuffs. The critical

8

question is whether in effectuating those two decisions the defendants intentionally hit, kicked, twisted fingers and slammed plaintiff's head into the wall. The videotape does not show plaintiff resisting and clearly shows some"blows" being administered. The videotape alone fails to match the identity of a particular officer to a particular"blow"; however, the videotape clearly shows all of the members of the team acting in concert in surrounding plaintiff and positioning themselves in such a way as to allow a controlled beating to be inflicted with minimal visual exposure. Further, the medical records corroborate the types of blows plaintiff alleges were inflicted. On these facts plaintiff has met his burden of proof on the subjective test of Whitley and Hudson.

On this basis, the magistrate judge concluded that the extraction team acted "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. In arriving at this conclusion, the magistrate judge relied primarily on the videotape, which, we agree, is sensible because it covers the entire incident in question.

We too have viewed the tape and thus have had the same opportunity as the magistrate judge had to evaluate this non-testimonial evidence. From our review, however, we find that the tape reveals no evidence of malicious or sadistic conduct. To the contrary, we are struck by the rational reaction and measured response of the correctional officers to Stanley's resistance and threats. We ordinarily show substantial deference to the factfinder in evaluating testimony because the factfinder has the opportunity to observe the demeanor of witnesses and make credibility judgments that we cannot make. But in this case we are viewing the same evidence that was viewed by the magistrate judge and have the same opportunity to evaluate what was seen. If such a review is not de novo, as is the case when we review a summary judgment record, then at the least we are in a better position to conclude that substantial evidence does not support the magistrate judge's finding. See Brice, 58 F.3d at 106.

The videotape shows a group of officers escorting Stanley into the isolation cell and, as he resists, pushing him up against the wall. One officer has his forearm up against the back of Stanley's neck and is

9

obviously applying force. In an effort to remove the metal handcuffs and apply flexible ones, the officers then take Stanley to the ground and place him face down. The tape shows several of the officers holding Stanley on the floor, lying or sitting on him to immobilize him while one officer is attempting to tie his hands behind his back with the flexible handcuffs. In attempting to tie the handcuffs, the officer is obviously moving his hand, wrapping the flexible plastic strips around Stanley's wrists. The other officers are merely standing around observing while one officer is taking notes.

In viewing this same scene, the magistrate judge found that the videotape shows a number of blows being inflicted upon Stanley. We could not find that evidence. While the tape displays a pulling motion which seems more like the action required to wrap and tighten a plastic flexicuff than a punch, we saw only one possible stomping motion by one of the officers. But the evidence was by no means clear and is certainly not sufficient evidence to conclude that Stanley was repeatedly beaten with blows that were sadistically and maliciously inflicted for the purpose of causing harm. While it is apparent that Stanley was being treated roughly, we simply could not see any evidence of wanton sadism. The officers used significant physical force in subduing Stanley, but they also had objectively reasonable grounds to believe that such force was necessary. They were quelling a disturbance and seeking to retain control of the prison and not punishing an inmate for verbal abuse.

Our review of the evidence leaves us with the "definite and firm conviction that a mistake has been committed" in finding that the officers acted sadistically and maliciously for the sole purpose of causing harm. Because the evidence is insufficient to leave us with "a reliable inference of wantonness in the infliction of pain," we must rule as a matter of law that the subjective component has not been satisfied. Whitley, 475 U.S. at 322.

IV

We are likewise persuaded that Stanley's claim fails as a matter of law under the objective component of the Hudson test. Our inquiry is whether the injury of which Stanley complains is significant enough, when viewed in its factual context, to amount to a violation

10

of his right to be free of cruel and unusual punishment, a right which "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." Rhodes v. Chapman, 452 U.S. 337, 346 (1981) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion)). It is established, however, that prison officials do not violate the Eighth Amendment whenever it appears in retrospect that the infliction of pain during a security measure could theoretically have been avoided. See Whitley, 475 U.S. at 319.

In this case, the correctional officers were in the process of quelling a disturbance in a section of the prison which housed inmates with disciplinary problems. Inmates had been lighting fires, flooding the halls, and throwing objects across the tier. The tension within the prison was understandably high. In removing the ringleaders from their cells, correctional officers had to use pepper spray to subdue two. Stanley himself stated several times that he was going to "f--k the whole goddamn jail up" and "f--k this jail up," statements which he explained later were threats to set more fires. The evidence supports no suggestion that the correctional officers responded to this uprising for any reason other than to bring order. And Stanley could not reasonably have expected treatment on the same level as if he were in a civilized conference with the warden. He was angry, highly charged, threatening, resisting, and kicking. Furthermore, he threatened to stab a prison guard -- a threat that is not hollow in a prison environment. Indeed, the extraction procedure followed in this case recovered at least one shank.

In this context, we take care not to impose our own judgment as to what might be necessary for that of prison officials. When the correctional officers were removing Stanley from his cell to an isolation cell, they found it necessary to act cautiously and with force. Several officers held him firmly against the wall, and one officer put his forearm behind Stanley's neck. In taking Stanley to the ground to change his handcuffs, force was again necessary and was applied, both to take him down and to hold him in place to overcome his kicking and resistance. If a punch or a kick did occur during these events, we cannot conclude "in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Whitley, 475 U.S. at 319. The Supreme Court has instructed that "not every push or shove, even if it may later seem

11

unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Hudson, 503 U.S. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The magistrate judge found that Stanley sustained bruising, swelling, and a loosened tooth. While he acknowledged that the injuries were not severe, he found them constitutionally significant when he compared them to the injuries that were evaluated in Hudson, concluding on that basis that the injuries presented to him were not de minimis. In Hudson, however, not only were the injuries more severe, but they were inflicted in a context totally different from that presented in this case. The Supreme Court noted that after Hudson and a prison guard had argued, the guard

> placed Hudson in handcuffs and shackles, took the prisoner out of his cell, and walked him toward the penitentiary's "administrative lockdown" area. Hudson testified that, on the way there, [the guard] punched Hudson in the mouth, eyes, chest, and stomach while [another guard] held the inmate in place and kicked and punched him from behind. He further testified that Mezo, the supervisor on duty, watched the beating but merely told the officers"not to have too much fun."

503 U.S. at 4. Prior to this beating, there was no evidence that the guard had been threatened with any physical injury. Indeed, while the state took the position that the guard's actions were not only unauthorized but also isolated, the Court noted that the two guards who punished Hudson also "beat another prisoner shortly after they finished with Hudson." Id. at 12. The injuries sustained by Hudson were bruises, swelling, loosened teeth, and a cracked dental plate which was rendered unusable for several months. Id. at 4.

In urging us to find the force excessive in the case before us, Stanley argues that his injuries were similar to those presented in Hudson. In doing so, he overlooks the fact that the injuries in Hudson were inflicted deliberately to hurt, without justification, and as punishment for a personal disagreement between a guard and a prisoner. That context is important, indeed essential, to determining whether force is excessive. This becomes readily apparent when we compare the con-

12

text in Hudson with that in Whitley. In Whitley, the inmate was shot in the leg while officers were attempting to quell a major disturbance. While the uprising was a serious one, the Court nonetheless held that because the officers were seeking in good faith to establish order, the evidence did not support a "reliable inference of wantonness in the infliction of pain." 475 U.S. at 322. Recognizing the importance of context, the Whitley Court explained that the shooting was part of a good faith effort to restore order to the prison. It therefore found the shooting not to violate the prohibition against cruel and unusual punishment. Id. at 326.

For the same reasons expressed in Whitley, we hold that the force that the correctional officers used in this case to quell the disturbance in the A-Wing Segregation Tier was reasonably necessary to restore order and that the injury resulting from that force was not excessive.

As an additional reason for reaching our conclusion, we hold that the finding that Stanley sustained a loosened tooth during the disturbance is unsupported by the record. While Stanley's loosened tooth was a reasonably foreseeable consequence of the force necessarily used, that finding of injury was nevertheless inadequately supported. The magistrate judge found that Stanley sustained bruises of his right arm, left jaw, left and right wrists and back, and a loosened tooth. The bruises are supported by the evidence admitted at trial, including Stanley's medical records. When Stanley was taken for medical treatment immediately after the incident, he complained of pain about his mouth and arms. Moreover, the day after the disturbance, Stanley was seen twice, first for similar complaints plus a complaint that his flexible handcuffs had been attached too tightly. And when a nurse visited Stanley later that same day, Stanley complained of pain in his leg, back, wrists, and right arm. But during none of these medical consultations did Stanley complain about a loosened tooth. Moreover, both when he filed a complaint with prison officials and when he filed his complaint in this case, he described events of the disturbance in significant detail, including the nature of his injuries, but at neither time did he mention a loosened tooth.

Stanley's medical records do reveal that he had a bad tooth, about which he complained several months before the prison disturbance. Also, almost two weeks after the disturbance, he complained again

13

about the tooth hurting "while he is eating." The doctor found that Stanley had a cyst or a cystic mass in his gum, but he indicated that none of Stanley's teeth were loose. Finally, in April 1994, three months after the disturbance, Stanley had the bad tooth extracted.

Nevertheless, at trial, Stanley attributed a loose tooth to the force applied at the prison disturbance. When Stanley's counsel asked whether Stanley had required "any other medical care or treatment as a direct result of what happened to you on January 6, 1994 at some later point on January 19, 1994," Stanley testified that he "put in for a dental appointment" because his teeth were"messed up" during the January 6 disturbance. His counsel then led Stanley with the following two questions, "Was the tooth loose?" and"Did it have to be removed?", to which Stanley replied, "Yes." None of the contemporary data nor the medical records, however, link Stanley's bad tooth to the incident on January 6, and we believe that the magistrate judge's factual finding that a tooth was loosened is inadequately supported.

Even with the finding of a loosened tooth, however, we find that bruises, swelling, and a loosened tooth sustained in a fracas that occurred while prison guards were trying to quell a disturbance are constitutionally insignificant and distinct from a loosened tooth and a cracked dental plate sustained in the context of punishment deliberately inflicted by guards because of a verbal argument. Cf. Hudson, 503 U.S. at 4.

V

Because we find that the correctional officers did not use constitutionally excessive force in subduing Stanley and removing him from a prison disturbance, we do not need to consider the officers' alternative argument that they are entitled to qualified immunity.

For the foregoing reasons, we reverse the judgment of the district court.

REVERSED

14