PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KENNETH MANIGAN,

*Defendant-Appellant.*

No. 08-4292

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
Henry M. Herlong, Jr., Senior District Judge.
(7:07-cr-00832-HMH-1)

Argued: October 30, 2009

Decided: January 26, 2010

Before MICHAEL, KING, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Agee joined. Judge Michael wrote a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED**: Joseph Bradley Bennett, SALVINI & BENNETT, LLC, Greenville, South Carolina, for Appellant. William J. Watkins, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee. **ON**

**BRIEF**: Jessica Salvini, SALVINI & BENNETT, LLC, Greenville, South Carolina, for Appellant. W. Walter Wilkins, United States Attorney, Columbia, South Carolina, E. Jean Howard, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee.

---

## OPINION

KING, Circuit Judge:

Kenneth Manigan pursues this appeal from his sentence in the District of South Carolina on three convictions for possession with intent to distribute cocaine, in contravention of 21 U.S.C. § 841(a)(1). Two contentions are presented for our consideration. First, the Government maintains that Manigan waived his right of appeal, precluding our review of any assertion of sentencing error. Second, Manigan contends that he is entitled to be resentenced because the district court erroneously enhanced his sentence, pursuant to section 2D1.1(b)(1) of the Sentencing Guidelines, for the specific offense characteristic of possession of a dangerous weapon. As explained below, we reject the proposition that Manigan waived his right of appeal. On the merits, we deny Manigan's sentencing contention and affirm.

I.

A.

Manigan's sentence is predicated on his involvement in three drug offenses that occurred between April and June 2007. On April 4, 2007, a confidential informant (the "CI") was arrested in Spartanburg, South Carolina, in possession of approximately 4.5 ounces of cocaine.[1] The CI immediately

---

[1]The facts spelled out herein are largely drawn from Manigan's Presentence Investigation Report, which the sentencing court adopted, supple-

cooperated with the authorities and identified Manigan as his drug supplier, advising them that he owed Manigan for nine ounces of cocaine. The following day, April 5, 2007, the CI met with Manigan in the front yard of the residence at 202 Charlesworth Avenue in Spartanburg.[2] After a brief conversation, the two men entered the CI's car, where the CI paid Manigan $5600 in cash for the nine ounces of cocaine.

Thereafter, on May 26, 2007, the CI advised the authorities that Manigan had phoned that morning to arrange a meeting for the delivery of approximately 4.5 ounces of cocaine. As a result, Manigan and the CI soon met in the parking lot of a CVS Pharmacy on Union Street in Spartanburg. While there, Manigan "fronted" the CI 124.56 grams of cocaine.[3] Four days later, on May 30, 2007, the CI called Manigan to arrange for payment of the fronted cocaine. The two men met outside the residence at 202 Charlesworth Avenue, where the CI paid Manigan $2800 in cash for the fronted cocaine.

Finally, on June 11, 2007, the CI again called Manigan and asked him to front two ounces of cocaine. Manigan agreed and sent "Tom Boy," one of his colleagues, to deliver 57.5 grams of cocaine to the CI, in exchange for $1700 in cash to be paid when the cocaine was sold. On June 13, 2007, Manigan and the CI agreed to meet at a residence on Pennwood Drive in Spartanburg so that the CI could pay Manigan. After

---

mented by relevant aspects of the record. *See* J.A. 60, 74–88. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[2]The Presentence Investigation Report identifies Manigan's address as 202 Charlesworth Avenue, Spartanburg, SC 29306. Manigan's mother may have owned that property.

[3]"Fronting" is the common practice of a drug supplier delivering illegal drugs to a dealer on consignment. In a fronting transaction, the drug dealer receives the drugs up front and pays his supplier later, after the drugs have been sold on the street. *See United States v. Scheetz*, 293 F.3d 175, 179 n.1 (4th Cir. 2002).

obtaining $1700 in cash from the authorities, the CI drove to the Pennwood Drive residence. Manigan was waiting inside and the CI gave Manigan the money.

On June 20, 2007, the authorities executed a search warrant at 202 Charlesworth Avenue. In the back right bedroom of the residence, the agents found two shoe boxes. One shoe box, found on the right side of the bed, contained two handguns, which the agents seized.[4] One of the seized firearms was later determined to be stolen. The second shoe box, found near where the handguns were seized, contained "various papers addressed to Manigan at 202 Charlesworth Avenue." J.A. 78. The federal agents also searched a 1990 Chevrolet Caprice located at the residence and seized a bag containing 3.26 grams of cocaine from under the driver's seat. Manigan was the registered owner of the Caprice. Manigan was arrested that very day in possession of 32.05 grams of marijuana, 6.70 grams of crack cocaine, and $9520 in cash.[5] During an interview with the authorities on June 27, 2007, and again at sentencing, Manigan admitted that the seized handguns were his.

B.

On July 10, 2007, the grand jury in Spartanburg returned a three-count indictment against Manigan, each count charging possession with intent to distribute cocaine, in contravention of 21 U.S.C. § 841(a)(1). On October 23, 2007, Manigan pleaded guilty to all three counts. In the plea agreement between Manigan and the Government (the "Plea Agreement"), Manigan agreed, inter alia, to

---

[4]The Presentence Investigation Report does not indicate whether either of the two handguns seized from the residence at 202 Charlesworth Avenue was loaded.

[5]Manigan's counsel acknowledged at oral argument that Manigan's June 20, 2007 arrest occurred at the 202 Charlesworth Avenue residence. The Government's counsel was unable to confirm this concession, nor does the record clearly support it. We do not rely on the concession.

> waive[ ] the right to contest either the conviction or the sentence in any direct appeal or other post-conviction action.

J.A. 49. At the completion of his plea hearing, however, the district court advised Manigan, without objection, that "[o]nce you are sentenced, you and the Government may have a right to appeal this sentence." *Id.* at 30.

After Manigan's guilty pleas, the probation officer calculated Manigan's Guidelines range as 151 to 188 months, premised on an offense level of 29 and a criminal history category of VI. The Presentence Investigation Report (the "PSR") arrived at this offense level by starting with a base offense level of 26 and then recommending a two-level enhancement, pursuant to section 2D1.1(b)(1) of the Guidelines, for the specific offense characteristic of possession of a dangerous weapon (the "weapon enhancement"), which resulted in an adjusted offense level of 28.[6] Because Manigan qualified as a career offender, however, the PSR enhanced his offense level to 32. *See* USSG § 4B1.1. Finally, the PSR subtracted three levels for acceptance of responsibility, resulting in a total offense level of 29. *See id.* § 3E1.1.

On January 28, 2008, Manigan filed a written objection to the PSR's references to firearm possession and to application of the weapon enhancement. His contention did not directly relate, however, to the essential nexus between the seized firearms and his offense conduct. Instead, Manigan challenged only the PSR's reference to his ownership of the firearms. More specifically, Manigan claimed that he admitted such

---

[6]Manigan was sentenced under the 2007 edition of the Guidelines. Section 2D1.1(b)(1) is found in Chapter Two of the Guidelines, entitled "Offense Conduct." Subsections of Chapter Two describe "specific offense conduct" that can impact a defendant's offense level. One of the "specific offense characteristics" applicable to drug-trafficking offenses provides that, "[i]f a dangerous weapon (including a firearm) was possessed, increase [the offense level] by 2 levels." USSG § 2D1.1(b)(1).

ownership as part of an immunized proffer he had made to the prosecutors, arguing that such circumstances precluded the sentencing court from using the ownership admission against him. The probation officer responded that the authorities had independently established Manigan's ownership of the two firearms prior to any such proffered admission and that, as a result, the PSR's recommended application of the weapon enhancement was appropriate.

Manigan first objected to the nexus aspect of the weapon enhancement at his sentencing hearing on February 28, 2008. More specifically, Manigan orally contended that the Government had failed to establish that the handguns seized at 202 Charlesworth Avenue were sufficiently related to his offenses of conviction. The Government countered that the PSR properly recommended the weapon enhancement. The prosecutors emphasized that (1) cocaine was found in Manigan's car during the search at the Charlesworth Avenue residence, and (2) the authorities had observed Manigan proceed directly from the Charlesworth Avenue residence to other locations where he engaged in fronting transactions.

At the conclusion of the sentencing hearing, the district court adopted "the findings including the guideline calculations contained in the [PSR]," thus overruling Manigan's objection to the weapon enhancement. J.A. 60. The court then determined Manigan to be a career offender, calculated his advisory Guidelines range as 151 to 188 months, and sentenced him to concurrent terms of 169 months on each of his three convictions, followed by three years of supervised release. Notably, the district court concluded the sentencing proceedings by again advising Manigan that he "ha[d] the right to appeal this sentence." *Id.* at 66. Manigan has filed a timely notice of appeal, and we possess jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

II.

The issue of whether a defendant has waived his right of appeal in connection with a plea proceeding "is a matter of

law that we review de novo." *United States v. Brown*, 232 F.3d 399, 403 (4th Cir. 2000). In assessing whether a district court has properly applied the Guidelines — including the application of an enhancement — "we review the district court's legal conclusions de novo and its factual findings for clear error." *United States v. Layton*, 564 F.3d 330, 334 (4th Cir. 2009). The question of whether a defendant, as a specific offense characteristic, possessed a dangerous weapon for purposes of the weapon enhancement is a factual determination subject to clear error review. *See United States v. Rusher*, 966 F.2d 868, 880 (4th Cir. 1992).

## III.

The Government's primary contention in this proceeding is that we need not address the merits of Manigan's appeal, because the Plea Agreement's appellate waiver mandates dismissal. Manigan's sole appellate contention is that the district court erred in its application of the weapon enhancement. We assess these contentions in turn.

## A.

We first analyze the Government's assertion that this appeal must be dismissed because Manigan waived his right of appeal. The Government contends that the Plea Agreement's plain and unambiguous terms, coupled with Manigan's plea colloquy representation that he had discussed the Agreement with his attorney and understood its terms, demonstrate that Manigan knowingly and intelligently waived his right of appeal.[7]

---

[7]The waiver provision of the Plea Agreement, on which the Government relies for its contention that Manigan's appeal must be dismissed, is in Paragraph 14, which states as follows:

The Defendant is aware that 18 U.S.C. § 3742 and 28 U.S.C. § 2255 afford every defendant certain rights to contest a conviction and/or sentence. Acknowledging those rights, the Defendant,

We have heretofore recognized that a defendant can, through a plea agreement, waive his appellate rights. *See United States v. Poindexter*, 492 F.3d 263, 267–68 (4th Cir. 2007). And we will enforce such a waiver if it is valid and if the issue sought to be appealed is within its scope. *See United States v. Blick*, 408 F.3d 162, 168 (4th Cir. 2005). An appellate waiver is valid if the defendant knowingly and intelligently agreed to it. *See id.* at 169. Whether a defendant knowingly and intelligently agreed to waive his right of appeal "must be evaluated by reference to the totality of the circumstances." *See United States v. General*, 278 F.3d 389, 400 (4th Cir. 2002).

An important factor in such an evaluation is whether the district court sufficiently explained the waiver to the defendant during the Federal Rule of Criminal Procedure 11 plea colloquy. *See General*, 278 F.3d at 400. Indeed, Rule 11 specifically mandates that a district court, before accepting a plea of guilty,

> inform the defendant of, and determine that the defendant understands, . . . the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence.

Fed. R. Crim. P. 11(b)(1)(N). Although a district court's failure to strictly abide by Rule 11 will not alone render an appel-

---

in exchange for the concessions made by the Government in this Plea Agreement, waives the right to contest either the conviction or the sentence in any direct appeal or other post-conviction action, including any proceedings under 28 U.S.C. § 2255. This waiver does not apply to claims of ineffective assistance of counsel or prosecutorial misconduct. This Agreement does not affect the rights or obligations of the Government as set forth in 18 U.S.C. § 3742(b). Nor does it limit the Government in its comments in or responses to any post-sentencing matters.

J.A. 49.

late waiver unenforceable, *see General*, 278 F.3d at 400, "a waiver is not knowingly or voluntarily made if the district court fails to specifically question the defendant concerning the waiver provision of the plea agreement during the Rule 11 colloquy and the record indicates that the defendant did not otherwise understand the full significance of the waiver," *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992).

After carefully assessing the relevant record, we are not convinced that Manigan's appellate waiver should be enforced. During the Rule 11 proceeding, the district court established that Manigan was a high school graduate who had attended two years of college, and it ascertained that he had discussed the Plea Agreement with his counsel and under-stood its provisions. Although these circumstances suggest that Manigan should have understood the appeal waiver, *see General*, 278 F.3d at 400, the balance of the plea colloquy fatally taints the waiver's enforceability, *see Marin*, 961 F.2d at 496. First, the court never specifically mentioned the waiver provision or questioned Manigan on it. In fact, con-trary to the Plea Agreement, the court advised Manigan that he *would* be able to appeal his sentence. Moreover, the prose-cutors interposed no objection to the court's advice to Mani-gan that he could appeal, and they failed to inform the court that the Plea Agreement contained the waiver provision.

Simply put, we are unable in these circumstances to enforce the appellate waiver. When a district court has advised a defendant that, contrary to the plea agreement, he is entitled to appeal his sentence, the defendant can hardly be said to have knowingly waived his right of appeal. *See United States v. Zink*, 107 F.3d 716, 718 (9th Cir. 1997) (concluding that waiver was neither knowing nor voluntary where court advised defendant, without objection, that he had right to appeal); *United States v. Ready*, 82 F.3d 551, 557–58 (2d Cir. 1996) (allowing defendant to appeal sentence despite appel-late waiver because court incorrectly advised defendant of right to appeal sentence); *see also United States v. Wood*, 378

F.3d 342, 349 (4th Cir. 2004) (determining that defendant did not knowingly waive right to appeal, in part because court mischaracterized plea agreement's material terms during plea colloquy). It is worthy of emphasis that, in these Rule 11 proceedings, there was simply no discussion of the waiver issue. *See United States v. Wessells*, 936 F.2d 165, 168 (4th Cir. 1991) (concluding that waiver was not voluntary, in part because sentencing court failed to question defendant concerning waiver provision). Finally, this problem was compounded three months later, at the conclusion of Manigan's sentencing hearing, when the court again advised Manigan that he "ha[d] the right to appeal this sentence." J.A. 66. In these circumstances, the waiver contention interposed by the Government must be rejected.

Having declined to dismiss Manigan's appeal on the basis of the Government's waiver contention, we must turn to the merits of his appeal — the issue of whether the district court erred when it increased his offense level by applying the weapon enhancement.

## B.

### 1.

Section 2D1.1 of the Sentencing Guidelines establishes the base offense level for narcotics offenses, including the 21 U.S.C. § 841(a)(1) offense on which Manigan was thrice convicted. *See* USSG § 2D1.1(a). Subsection (b) of section 2D1.1 identifies several "Specific Offense Characteristics" that, when applicable, warrant an offense-level enhancement. *See id.* § 2D1.1(b). The specific offense characteristic implicated in this appeal provides that, "[i]f a dangerous weapon (including a firearm) was possessed," the sentencing court is to "increase by 2 levels" the offense level. *Id.* § 2D1.1(b)(1).

The relevant Application Notes provide that the weapon enhancement "should be applied if the weapon was present,

unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n.3. As Judge Wilkins explained, the Government must prove by a preponderance of the evidence that "the weapon was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." *United States v. McAllister*, 272 F.3d 228, 233–34 (4th Cir. 2001) (internal quotation marks omitted). To satisfy that burden, however, the Government does not need to prove "precisely concurrent acts," such as a "gun in hand while in the act of storing drugs." *United States v. Johnson*, 943 F.2d 383, 386 (4th Cir. 1991). Rather, proof of constructive possession of the dangerous weapon is sufficient, and the Government is entitled to rely on circumstantial evidence to carry its burden. *See United States v. Miggins*, 302 F.3d 384, 391 (6th Cir. 2002); *United States v. Hall*, 46 F.3d 62, 64 (11th Cir. 1995).

In assessing whether a defendant possessed a firearm in connection with relevant drug activity, a sentencing court is entitled to consider several pertinent factors. One important factor is the type of firearm involved. *See United States v. Drozdowski*, 313 F.3d 819, 822 (3d Cir. 2002) (identifying type of firearm as relevant to application of weapon enhancement). As Judge Wilkinson explained in *United States v. Harris*, 128 F.3d 850, 853 (4th Cir. 1997), and as the Guidelines emphasize, *see* USSG § 2D1.1(b)(1) cmt. n.3, an unloaded hunting rifle is a firearm that would not be readily connected to drug activities. A handgun, on the other hand, has been deemed "a tool of the drug trade because it is easy to conceal yet deadly." *United States v. Cantero*, 995 F.2d 1407, 1411 (7th Cir. 1993) (internal quotation marks and alteration omitted); *see also United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999) (observing that handguns are "indicia of drug dealing"). More specifically, a drug trafficker is much more likely to utilize a handgun — as opposed to a rifle or long gun — due to size and concealability. *See United States v. Lipford*, 203 F.3d 259, 267 n.7 (4th Cir. 2000) ("When a gun is

involved in criminal activity, it is far more likely to be a hand-gun than a rifle.").

The location or proximity of a seized firearm is also relevant to a sentencing court's analysis of whether it was possessed in connection with drug activities that were part of the same course of conduct or common scheme as the offense of conviction. Indeed, "the proximity of guns to illicit narcotics can support a district court's enhancement of a defendant's sentence under section 2D1.1(b)(1)." *Harris*, 128 F.3d at 852. Similarly, firearms that are readily accessible during drug activities can be deemed as possessed in connection therewith. *See United States v. Corral*, 324 F.3d 866, 873 (7th Cir. 2003) ("[G]uns found in close proximity to drug activity are presumptively connected to that activity."); *Drozdowski*, 313 F.3d at 823 (discussing accessibility as relevant factor). If a drug offender has stored a handgun that can readily be accessed if his drug activities turn sour, he may be said to have possessed it in connection with such activities. *Cf. United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002) (recognizing that readily accessible firearm suggests close nexus between drug activities and firearm possession). In short, as one of our sister circuits has explained, so long as a firearm's "location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapon[ ] to the offense conduct." *United States v. Corcimiglia*, 967 F.2d 724, 727 (1st Cir. 1992).

Importantly, a sentencing court faced with whether to apply the weapon enhancement is entitled to take reasonable account of the settled connection between firearms and drug activities. As the Guidelines commentary explains, the weapon enhancement "reflects the increased danger of violence when drug traffickers possess weapons." USSG § 2D1.1 cmt. n.3. And, under our precedent, "drugs and guns form a lethal combination that can lead to violence," *Harris*, 128

F.3d at 852, especially when substantial drug trafficking is involved, *see United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994) ("[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms . . . ." (internal quotation marks omitted)). As another court of appeals emphasized, "substantial dealers in narcotics keep firearms on their premises as tools of the trade." *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976). Thus, a sentencing court might reasonably infer, in the proper circumstances, that a handgun seized from the residence of a drug trafficker was possessed in connection with his drug activities.[8]

### 2.

Manigan's sole appellate contention is that the Government failed to satisfy its burden of proof in support of the weapon enhancement. Although he concedes ownership of the handguns seized from the back right bedroom of the Charlesworth Avenue residence, Manigan maintains that the Government failed to sufficiently prove that he possessed those weapons in connection with his drug activities.[9] The pertinent facts,

---

[8]If the Government satisfies its burden of proving possession of a weapon in connection with drug activities, the defendant is entitled to persuade the sentencing court that the weapon enhancement is inapplicable. He may do so by showing that it was "clearly improbable" that the weapon was connected with his drug activities. *See, e.g.*, *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005) ("If the government [proves by a preponderance of the evidence that the defendant possessed the weapon], the burden shifts to the defendant to show that it was 'clearly improbable' that the weapon was connected to the offense."); *United States v. Heckard*, 238 F.3d 1222, 1233 (10th Cir. 2001); *United States v. Calhoun*, 49 F.3d 231, 236 (6th Cir. 1995); *Hall*, 46 F.3d at 63; *Corcimiglia*, 967 F.2d at 727–28. When the government satisfies its burden, however, and if the defendant fails to make the "clearly improbable" showing, the weapon enhancement may properly be applied. *See Harris*, 128 F.3d at 853.

[9]Manigan has not further pursued the immunity contention he raised in the district court with respect to his proffer of handgun ownership. For our purposes, therefore, he owned both of the handguns seized from the Charlesworth Avenue residence.

Manigan emphasizes, fail to show "that [he] utilized the fire-arms during his drug activity." Br. of Appellant 11. This assertion misses the point, however, because it was not necessary for Manigan to have actually "utilized" the seized handguns during an observed and prosecuted drug transaction. Rather, the Government's burden was to prove, by a preponderance of the evidence, that Manigan possessed the handguns "in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." *McAllister*, 272 F.3d at 233-34.

Our resolution of this appellate contention implicates a circumstantial evidence issue, and the sentencing court's application of the weapon enhancement presents a relatively close question. *Cf. McAllister*, 272 F.3d at 233–34 (deeming weapon enhancement inapplicable where only evidence of possession was witness's statement); *United States v. Nelson*, 6 F.3d 1049, 1056 (4th Cir. 1993) (affirming weapon enhancement when handguns found in dwelling where drugs seized); *United States v. Rusher*, 966 F.2d 868, 880 (4th Cir. 1992) (affirming weapon enhancement when drugs and handgun seized from same briefcase). This issue, however — even if it could have been resolved differently — is reviewed only for clear error, *see Harris*, 128 F.3d at 852, and the trial court's fact-finding in support of the enhancement is entitled to appropriate deference, *see* 18 U.S.C. § 3742(e) ("The court of appeals . . . shall accept the findings of fact of the district court unless they are clearly erroneous . . . .").

Applying a clear error standard, we "will not reverse a lower court's finding of fact simply because we would have decided the case differently." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks omitted). According to the Supreme Court, we can find clear error only if, "'on the entire evidence,' [we are] 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). We have identified clear error when we have determined that,

"without regard to what the actual facts may be, the findings under review . . . are not supported by substantial evidence." *Stanley v. Hejirika*, 134 F.3d 629, 633 (4th Cir. 1998) (internal quotation marks omitted); *see United States v. Whorley*, 550 F.3d 326, 338 (4th Cir. 2008) (defining "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support" the finding under review).

Because the Government bore the burden — by a preponderance — of showing that the weapon enhancement was appropriate, *see United States v. Urrego-Linares*, 879 F.2d 1234, 1238 (4th Cir. 1989), we must be mindful of what that burden entails. As the Supreme Court has explained, "[t]he burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation marks omitted).

Thus, our task in analyzing the weapon enhancement's applicability is somewhat comparable to the appellate review of a jury verdict in a civil case: we must affirm if there was substantial evidence to support the finding that it was more probable than not that Manigan possessed the handguns seized at 202 Charlesworth Avenue in connection with the common scheme or plan of his drug activities. In making that assessment, the following pertinent facts were either expressly found by the PSR and the sentencing court, or could reasonably be inferred from the facts so found:

- Predicated on the large quantities of drugs that Manigan fronted, he was a substantial drug supplier in the Spartanburg area;

- Manigan resided at 202 Charlesworth Avenue, where portions of his April and May drug trans-

actions occurred. And the authorities observed Manigan travel directly from the residence to other locations where he engaged in drug-fronting transactions. The Charlesworth Avenue residence was thus central to the common scheme or plan relating to Manigan's drug activities;

- During the search of June 20, 2007, cocaine was seized from Manigan's Caprice on the Charlesworth Avenue property and the two handguns were seized from the back right bedroom of the residence, where his personal papers were also found;

- The handguns were seized from a shoebox on the right side of the bed and were thus readily accessible to an occupant of the residence; and

- When Manigan was arrested on June 20, 2007, he possessed on his person substantial quantities of marijuana and crack cocaine, plus nearly $10,000 in cash.

The proximity — or lack thereof — between the two handguns and the drugs seized from Manigan's person and his Caprice is the strongest contention that he can muster against application of the weapon enhancement, and Manigan understandably emphasizes it. *But see United States v. Hall*, 473 F.3d 1295, 1312 (10th Cir. 2007) (concluding weapon was connected to drug activities where shotgun was stored in defendant's car and drug paraphernalia was found in his residence); *United States v. Almonte*, 952 F.2d 20, 21–22 (1st Cir. 1991) (affirming application of weapon enhancement where cocaine was stored in defendant's residence and handgun was seized from his store, located across street from residence). Whether there was, in this case, sufficient proximity between the handguns and the drugs is a factual issue, and the location of the seized handguns, in the context of Manigan's drug

activities, does not preclude the court's application of the weapon enhancement. *See Corral*, 324 F.3d at 873 ("[G]uns found in close proximity to drug activity are presumptively connected to that activity."). It is sufficient that the firearms were seized from the location — 202 Charlesworth Avenue — that was the focal point of Manigan's drug fronting transactions, and the handguns could be deemed readily accessible to him. In addition, unlike the possession of an unloaded hunting rifle, Manigan possessed two handguns, the weapons of choice for drug suppliers. *See Ward*, 171 F.3d at 195.[10] Finally, Manigan was a substantial drug supplier and, as such, was an offender who would typically possess a handgun in connection with drug activities. *See Kennedy*, 32 F.3d at 882; *United States v. Hinds*, 856 F.2d 438, 443 (1st Cir. 1988).

Because the PSR recitation circumstantially supports the district court's application of the weapon enhancement — and because Manigan failed to show that it was "clearly improbable" for the handguns to be connected to the common scheme or plan surrounding his drug activities, *see supra* note 8 — the district court was entitled to rule as it did.[11] Thus, the court did not clearly err, and Manigan's appellate contention must be rejected.[12]

---

[10]As noted, *see supra* note 4, the record does not indicate whether the handguns were loaded when they were seized. In any event, the weapon enhancement may properly be applied for possession of an unloaded handgun. *See Harris*, 128 F.3d at 853 ("[T]he mere fact that a weapon is unloaded cannot prevent a court from enhancing a sentence under Section 2D1.1(b)(1).").

[11]We note that the district court, in determining whether to apply the weapon enhancement, appropriately relied on the PSR, as Manigan failed to show that the PSR was inaccurate. *See United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998) ("Without an affirmative showing the information is inaccurate, the court is free to adopt the findings of the presentence report without more specific inquiry or explanation." (internal quotation marks and alterations omitted)).

[12]Finally, the Government argues that, if the district court erroneously applied the weapon enhancement, such error would be harmless, as the

IV.

Pursuant to the foregoing, we reject the Government's appellate waiver contention and affirm Manigan's sentence.

*AFFIRMED*

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

I concur in part III.A of the majority opinion, which holds that Kenneth Manigan did not waive his right to appeal his sentence. I respectfully dissent, however, from the majority's determination that the district court properly enhanced Manigan's sentence under guideline § 2D1.1(b)(1) for possession of a dangerous weapon. Manigan's handguns were not connected to the drug crimes he committed, and the enhancement should not apply.

Section 2D1.1(b)(1)'s weapon enhancement may be the most frequently applied enhancement in all the guidelines. *See* U.S. Sentencing Commission, *Sourcebook of Federal Sentencing Statistics* tbl. 3 (2008) (listing § 2D1.1 as the most frequently applied guideline); U.S. Sentencing Commission, Application of Weapon Specific Offense Characteristic in §2D1.1 Cases for Each Drug Type (2008) (enhancement

---

court ultimately calculated Manigan's sentencing range on the basis of his career offender status. *See United States v. Branch*, 537 F.3d 328, 343 (4th Cir. 2008) (observing that weapon enhancement had no impact on Branch's sentence because court sentenced him as career offender). Manigan maintains that application of the weapon enhancement was not harmless because it precludes him from participating in the Bureau of Prison's drug treatment program and possibly obtaining an early release, a contention that at least one circuit has apparently found persuasive. *See United States v. Torres*, 409 F.3d 1000, 1002–03 (8th Cir. 2005). Because the district court did not err in applying the weapon enhancement, however, we need not address this assertion.

applied in 2,845 out of 23,637 cases). This frequency of use makes it imperative that the boundaries for application of the enhancement remain clear and meaningful. Here, the majority's error is compounded by the fact that it blurs a previously clear boundary, leaving district courts to wonder whether any real limitation remains. To maintain clarity, we should hold to the purpose and scope of the enhancement as recognized until today.

Section 2D1.1(b)(1) reads: "If a dangerous weapon (including a firearm) was possessed, increase by **2** levels." U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) (2007). Application note 3 to § 2D1.1 describes the enhancement's purpose and reach:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

The application note confirms what is obvious from common sense, but perhaps not from a literal reading of § 2D1.1(b)(1): mere possession is not enough for application of the enhancement. The majority notes this limitation, citing *United States v. McAllister*'s rule that the government must prove that "the weapon was possessed *in connection with drug activity* that was part of the same course of conduct or common scheme as the offense of conviction." 272 F.3d 228, 233-34 (4th Cir. 2001) (emphasis added). Thus, for the enhancement to apply, the government must prove not only that the defendant possessed the weapon, but also that the weapon had a role in the offense of conviction. In the case of a gun, it need not have been discharged, brandished, or even kept on the defendant's person during the offense, *see United States v. Johnson*, 943

F.2d 383, 386 (4th Cir. 1991), but it must have served the defendant's purpose in carrying out the drug crime for which he was convicted. It is sufficient, for example, that the weapon was "readily available to protect" the defendant or his drugs, even if the defendant never specifically intended to use it. *United States v. Thongsophaporn*, 503 F.3d 51, 58 (1st Cir. 2007).

Unless the defendant's words or actions explained the weapon's role, proving that the § 2D1.1(b)(1) enhancement applies will require evidence that the weapon had a temporal and spatial nexus to the offense. *United States v. Willie*, 462 F.3d 892, 899 (8th Cir. 2006); *United States v. Clark*, 415 F.3d 1234, 1241 (10th Cir. 2005); *United States v. Partida*, 385 F.3d 546, 562 (5th Cir. 2004). When the defendant's possession of the weapon is not established until long after the offense, the temporal nexus is not satisfied. *See Clark*, 415 F.3d at 1242 (rejecting application of enhancement when defendant was found in possession of gun 15 months after offense of conviction). Similarly, when the weapon is not in close proximity to the drugs or a drug-related transaction, the spatial nexus is not satisfied. *See United States v. Harris*, 128 F.3d 850, 852 (4th Cir. 1997). In *United States v. Rusher* we held that the § 2D1.1(b)(1) enhancement applied when "one of the firearms was located in the same briefcase that contained the drugs, and the others, fully loaded, were found in the bed of the same truck." 966 F.2d 868, 880 (4th Cir. 1992). In *United States v. Nelson* we held that the enhancement applied when guns were found with defendants in "a place of manufacturing, storing and distributing [of] crack cocaine." 6 F.3d 1049, 1056 (4th Cir. 1993). Of course, even if a temporal and spatial nexus exists, other evidence might establish that it was clearly improbable that the gun had a role in the offense. For example, even if an unloaded hunting rifle was in a nearby closet in the defendant's residence during a drug transaction, the enhancement might not apply. § 2D1.1 cmt. n.3 (2007).

These controlling principles prohibit the application of the enhancement in this case because neither a temporal nor a spatial nexus existed. The majority sees a nexus between Manigan's handguns and his offense because the confidential informant gave Manigan cash for previously received drugs outside 202 Charlesworth Avenue on April 5, 2007, and May 30, 2007. On June 20, 2007, the police executed a search warrant for Manigan's car and the residence at that address. Although the police found cocaine and drug paraphernalia in Manigan's car, nothing of that sort was found in the residence. The police did find two handguns belonging to Manigan in a shoe box inside the house.

There is no evidence that Manigan possessed the handguns prior to June 20, 2007, the day of the search, let alone 20 days prior on May 30, 2007, the second (and last) day the informant paid Manigan for drugs outside the residence. There is no suggestion that the informant ever reported that there was a gun in Manigan's possession during the transactions. And the government does not claim that it had a suspicion prior to the search that Manigan possessed guns. (Neither the search warrant nor the application is in the record.) No evidence supports a finding that the guns Manigan possessed on June 20, 2007 — which he had received from a third party and intended to sell — were possessed on May 30, 2007.

Similarly, even assuming Manigan possessed the guns on May 30, 2007, they were not sufficiently close to the drug transaction to satisfy the spatial nexus requirement. Manigan trafficked in cocaine out of his car. Only his car is present at every face-to-face interaction with the informant, whether outside 202 Charlesworth Avenue or in the CVS Pharmacy parking lot. The police found drugs in Manigan's car, not in the residence at 202 Charlesworth Avenue. Unlike the house in *United States v. Nelson*, 202 Charlesworth Avenue was not "a place of manufacturing, storing and distributing [of] crack cocaine." 6 F.3d at 1056. The residence belonged to Manigan's mother, and Manigan merely lived there. The only con-

nection between the residence and Manigan's offense is that Manigan's car was parked outside. Moreover, despite the majority's assertion to the contrary, it would amount to a legal fiction to conclude that the guns were "readily available" to, or "constructively possessed" by, Manigan during the drug transactions. *Cf. Arizona v. Gant*, 129 S. Ct. 1710, 1718-19 (2009) (rejecting the "fiction . . . that the interior of a car is *always* within the immediate control of an arrestee who has recently been in the car") (quoting *New York v. Belton*, 453 U.S. 454, 466 (1981)) (emphasis in original). Had Manigan conducted a transaction outside 202 Charlesworth Avenue and been threatened with violence, keeping guns indoors and hidden in a shoe box would not have provided him any protection. Accordingly, the absence of both a temporal and spatial nexus precludes the enhancement.

The majority reaches a contrary conclusion after several missteps, starting with the standard of review it applies. Citing *Rusher*, the majority states that "[t]he question of whether a defendant, as a specific offense characteristic, possessed a dangerous weapon . . . is a factual determination subject to clear error review." *Ante* at 7. *Rusher*, however, says that the general rule for reviewing a guidelines determination is a "sliding scale" with primarily factual issues reviewed for clear error and primarily legal issues reviewed de novo. 966 F.2d at 880. It concludes that a finding of possession, that is, control or dominion over a weapon, is reviewed for clear error. *Id.* But a finding of weapon possession is not the final step. A determination of whether the weapon had a role in the offense of conviction is still required. Here, pure possession, along with the fact of the transactions themselves, is not disputed. We are left to review only whether the facts in the presentence report — adopted by the district court — require application of the enhancement. This question is primarily legal and should be reviewed de novo.

The majority's next error is to place disproportionate weight — in what is a case-specific inquiry — on the general

ground that handguns are associated with drugs and that there is a "settled connection between firearms and drug activities." *Ante* at 12. Indeed, the majority goes so far as to say that "a sentencing court might reasonably infer, in proper circumstances, that a handgun seized from the residence of a drug trafficker was possessed in connection with his drug activities." *Ante* at 13. Of all the cases cited by the majority in support of the association between handguns and drugs, only one cites any empirical evidence, and that evidence supports a strong (and obvious) correlation between handguns and firearm-related crimes, not drug-related crimes. *See United States v. Lipford*, 203 F.3d 259, 267 n.7 (4th Cir. 2000) (citing Department of Justice, Bureau of Justice Statistics, Selected Findings, *Firearms, Crime, and Criminal Justice: Guns Used in Crime* (July 1995)). In any event, like the "settled connection between firearms and drug activities," the connection between handguns and drugs is a reason for the inclusion of the weapons enhancement potential in § 2D1.1(b)(1), not a reason for relaxing the standard for determining whether a gun was connected to a particular drug offense. More specifically, giving sentencing courts what appears to be a green light to apply the § 2D1.1(b)(1) enhancement to every drug dealer with a handgun in his residence will practically eliminate any limitation on the scope of the provision.

Finally, the majority errs when it concludes that the handguns had a role in the offense in this case. Perhaps recognizing that the guns were not close enough to the drug transactions to support a spatial nexus, the majority attempts to link the 202 Charlesworth Avenue residence directly to Manigan's crimes. *Ante* at 15-16 ("[T]he Charlesworth Avenue residence was . . . central to the common scheme or plan relating to Manigan's drug activities."). In support of this link, the majority cites the two occasions when the informant gave Manigan money outside the residence and the fact that "the authorities observed Manigan travel directly from the residence to other locations where he engaged in drug-fronting transactions." *Id.* Manigan had to live somewhere, and simply

saying that he left his residence to go to other locations to do drug deals does not make his residence central to his drug trafficking. It is only Manigan's choice to accept payment from the informant on two occasions outside his residence that supports the argument that the residence had a "central" role in Manigan's drug dealings. This choice is not, however, enough to establish a role for the residence, and therefore for the gun, any more than Manigan's choice to meet in a CVS Pharmacy parking lot is sufficient to establish a role for CVS. The majority is left only with the transactions' relative proximity to the handgun which, as I have already noted, is not sufficient because the handguns were not close enough to be readily available for use by Manigan.

Because I conclude that the district court erred when it applied the enhancement, I must reach the question of whether the error was harmless. Manigan admits that if this court reversed the district court's application of the enhancement, his sentence would remain the same. He nevertheless argues that application of the enhancement prejudices him because it disqualifies him from the Bureau of Prison's (BOP) drug treatment program and therefore from early release. The government responds that this should not count as prejudice and that, in any event, the injury is hypothetical because there is no guarantee Manigan will be admitted to BOP's treatment program.

The Tenth Circuit opinion in *United States v. Torres* persuades me that the district court's error is not harmless. In *Torres* the court considered and rejected the exact argument advanced by the government here. 409 F.3d 1000, 1002-03 (10th Cir. 2005). The court reasoned that if the enhancement barred the defendant from a shorter sentence, it was clearly prejudicial, and the only question was whether the defendant needed to wait until he was actually denied acceptance to the BOP's program to challenge the enhancement. *Id.* at 1002. Because the defendant's challenge at that point would be through habeas corpus, and because a habeas petitioner can-

not challenge the execution of a sentence, denying review on direct appeal would deny all review. *Id.* at 1003. I agree with the Tenth Circuit's reasoning and conclude that this same prospect in Manigan's case requires a finding of prejudice.

Because the district court erred and the error is prejudicial, I would vacate Manigan's sentence and remand for him to be resentenced without the § 2D1.1(b)(1) weapon enhancement.